66

[No. 36457-3-II.   Division Two.   June 30, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. VERRICK VERE
YARBROUGH, *Appellant*.

*Sheri L. Arnold* and *Reed M.B. Speir*, for appellant.

*Gerald A. Horne, Prosecuting Attorney,* and *Kathleen Proctor, Deputy,* for respondent.

¶1 QUINN-BRINTNALL, J. — A jury found Verrick V. Yarbrough guilty of first degree murder by extreme indif-

ference, first degree assault, and second degree unlawful possession of a firearm. The jury also returned a special verdict finding that Yarbrough committed both the first degree murder and first degree assault to obtain or maintain his membership or to advance his position in the hierarchy of an organization, association, or identifiable group, and that both these offenses involved a destructive and foreseeable impact on persons other than the victim. Yarbrough appeals his conviction, arguing that (1) the trial court erred by improperly admitting gang-related evidence, (2) the admission of gang-related evidence deprived him of his right to a fair trial, (3) his defense counsel was ineffective for failing to request a limiting instruction on gang-related evidence and for failing to object to expert testimony related to gang evidence, (4) the evidence was not sufficient to establish that he committed a crime to advance his position in an identifiable group, (5) his right to be free from double jeopardy was violated when the trial court imposed an exceptional sentence for the aggravating factor that the murder involved a foreseeable impact on persons other than the victim, and (6) cumulative error deprived him of his right to a fair trial. We affirm.

## FACTS

BACKGROUND FACTS

¶2  In the early morning hours of July 8, 2006, shots fired outside "Club Friday," an underage dance club on Pacific Avenue in downtown Tacoma, temporarily paralyzed Tiffany Walker, injured Stephen Burnett, and left Rhaczio "Rha Rha" Simms dead. The State charged Yarbrough with first degree murder by extreme indifference in violation of RCW 9A.32.030(1)(b) (count I), first degree assault in violation of RCW 9A.36.011(1)(a) (count II), and second degree unlawful possession of a firearm in violation of RCW 9.41.040(2)(a)(i) (count III). The State also alleged that an exceptional sentence was warranted because the offenses were gang-related and counts I and II involved a destruc-

tive and foreseeable impact on persons other than the victim. RCW 9.94A.535(3)(r), (s).

¶3 The evidence at trial showed that four days earlier, on July 4, 2006, Yarbrough, also known as "V-Real," and a group of his friends had a verbal confrontation with Simms and a group of his friends at Tacoma's Ruston Way waterfront. Yarbrough's group was wearing blue clothing and someone from that group yelled, "This is Hilltop." 3 Report of Proceedings (RP) at 400. Then someone from Simms's group yelled, "This is the 96th." 3 RP at 400. Someone from the Hilltop group also said, "[I]f we weren't in front of the police, we would bust right now." 3 RP at 400. A witness understood "bust" to mean that if the police had not been there, they would have started shooting.

¶4 On the evening of July 7, 2006, into the early morning of July 8, 2006, Yarbrough and a group of his friends were at Club Friday. Yarbrough wore gang-related clothing, and he and his friends flashed gang signs and exclaimed, "This is Hilltop Crips" (Clerk's Papers (CP) at 4) and "fuck Folk, and fuck Bloods."[1] 3 RP at 474. A Club Friday security guard told Yarbrough and his friends that they had to stop or he would eject them.

¶5 Tiayrra Bradley and her cousin, Yunique Richardson, were also at Club Friday that evening. Bradley and Richardson left the club at some point between midnight and 1:30 AM. As they walked toward Bradley's car, Bradley and Richardson noticed Simms parking his car. When Simms said that he was going to Club Friday, Bradley and Richardson decided to walk back to the club with him.

¶6 As the three crossed the street toward Club Friday, Bradley heard someone yell, "What is up? This is Hilltop Crip." 3 RP at 411. Bradley turned toward the voice and saw Yarbrough with a group of seven or eight young men. Bradley then heard Yarbrough say, "This is Hilltop Crip, cuz, what you know about that." 3 RP at 460. Bradley noticed that Yarbrough had something in his hand and told

---

[1] Crips, Folk, and Bloods are the names of known street gangs.

Simms that she thought someone had a gun. Gunfire erupted from Yarbrough's group; Bradley and Richardson took cover behind a parked car. Richardson testified that she felt bullets fly past her and into a nearby bar. After the shooting, Bradley ran to her car and saw two moving cars collide, grazing each other. Richardson was still on the ground when she heard the collision. Richardson got up and ran to Bradley's car. When the women noticed that Simms was still lying on the ground, Bradley pulled her car up close to where Simms lay. Police arrived a few minutes later. Simms died from a gunshot wound to the back of his head.

¶7 Walker, Kiara Moore, and Channeka Voeuk were also at Club Friday that evening. Moore testified that she saw Yarbrough inside Club Friday wearing a blue jacket but she did not see him participate in any gang-related activity. Walker testified that she saw people she did not recognize in the club flashing gang signs. Walker, Moore, and Voeuk all left the club together sometime between 12:30 and 1:00 in the morning. Each woman testified that she heard gunfire as they approached Walker's car, which was parked across the street from Club Friday. In addition, Voeuk testified that she saw a group of around six young men standing opposite Club Friday but that she did not see where the shots were coming from. Walker testified that she saw Yarbrough shooting a gun across the street but not in their direction. She then saw Yarbrough running and heard gunfire from the opposite side of the street. A bullet struck Walker in the back and she fell to the ground. Walker's injuries initially left her paralyzed from the waist down but she was eventually able to walk again.

¶8 On the night of the shooting, Chad Legg was working security at On The Rocks, a bar located near Club Friday. Legg testified that he was outside the bar when he saw a young black man standing near a maroon car talking with two people in the back seat. Legg asked the young man for a light for his cigarette. About five or six minutes later, Legg heard gunfire and saw muzzle flashes across the street from On The Rocks. Legg also heard gunfire coming from a

different location. Legg saw the young man who had given him a light get shot and fall to the ground. Legg did not see who was firing the guns. After the shooting, Legg heard a car collision.

¶9 Phillip Dutra was also outside On The Rocks during the shooting. Dutra testified that he saw Simms run down the street and fall about 10 feet in front of him, but he stated that he did not realize at the time that Simms was shot. Dutra also saw a maroon colored car parked near On The Rocks and noticed that the trunk was open and that someone was digging around in it. He could not see who was reaching in the trunk because the trunk door obscured his view.

¶10 Burnett was a patron at On The Rocks on the night of the shooting. Burnett testified that he was inside the bar when the gunfire broke out. Burnett heard a zip, something ricochet behind him, and then a bullet struck his buttocks.

¶11 Johnnie Dudley was walking near Club Friday on the night of the shooting. Dudley testified that he heard gunfire coming from the east side of the street and saw shots coming from a group of people. Although Dudley could see that someone was holding a gun, he could not clearly see who that person was. Dudley did see Simms running from the gunfire as Simms was shot and fell to the ground.

¶12 Candac Rhem, Monica Johnson,[2] and William Terry went to Club Friday together on the night of the shooting. Rhem and Johnson left Club Friday sometime between midnight and 1:00 AM to get some food. After driving to a nearby fast food restaurant, they returned and parked near Club Friday next to Terrance Jackson's car to eat. Rhem and Johnson testified that they heard gunfire coming from the direction of Club Friday and that they saw a group of males, including Terry, Jackson, and Yarbrough running toward them. Terry and Terry's friend, Greg, jumped into Rhem's car while Jackson, Yarbrough, and at

---

[2] Johnson is also known as Monica Jenkins or Monica Johnson-Jenkins. Hereafter, she will be referred to as "Johnson."

least two other young men jumped into Jackson's car. Johnson testified that she saw that one of the young men who got into Jackson's car had a gun but Johnson could not identify him. Both cars drove to a Union 76 gas station in Tacoma's Hilltop neighborhood. Terry and Greg left Rhem's car and walked away from the gas station with a different group of people while Rhem drove Johnson home.

¶13 Michael Vaughn was walking to his car parked near Club Friday when he heard gunfire. As Vaughn drove southbound on Pacific Avenue, another vehicle struck his car. Vaughn pulled over and got out of his car. He then noticed Simms's body lying in the street. Vaughn testified that he saw a young African-American woman run screaming toward the body. Vaughn told her not to move the body and then returned to his car to wait for police to arrive.

¶14 Tacoma Police Officer David Yerbury testified that on July 8, 2006, he was patrolling the downtown Hilltop area of Tacoma when he heard six to seven gunshots followed a few seconds later by a second set of gunshots from a different caliber gun. Yerbury drove in the direction of screaming voices and saw groups of people running from the scene. When Yerbury arrived, he first saw Walker lying in the street and then Simms.

¶15 Police arrested Yarbrough the following day. Tavar Cook, an inmate at the Pierce County jail, testified that Yarbrough frequently spoke about his membership in the Hilltop Crip 16 gang, that he was in jail for the "murder that happened at Club Friday," and that "he was in the club and then him and this dude got into it [and] later on he dumped on him." 5 RP at 740-41. Cook understood "dumped on him" to mean that Yarbrough shot the man. Yarbrough also called Walker a "[b]itch" and a "snitch" and said, "By any means I can't have her testify." 5 RP at 744-45.

¶16 After getting a search warrant for Yarbrough's residence, police found numerous gang-related items such as (1) a footstool inscribed with gang insignia, (2) two black handkerchiefs, (3) a cell phone with video clips showing Yarbrough flashing gang signs, (4) a photograph of Yarbrough flashing a

gang sign, and (5) a shoebox containing a blue bandana and a loaded .22 caliber semiautomatic pistol not associated with the Club Friday shooting.

PROCEDURAL FACTS

¶17 On July 10, 2006, the State charged Yarbrough with first degree murder by extreme indifference, first degree assault, and second degree unlawful possession of a firearm. On August 6, 2006, the State amended the charging document to clarify an allegation of accomplice liability on the murder and assault charges.

¶18 On October 2, 2006, Yarbrough filed a motion to admit "other suspect evidence" and to exclude gang-related evidence. On that same date, the State filed a motion to admit gang-related evidence under ER 404(b). The State responded to Yarbrough's motion on December 11, 2006. The trial court heard the motions on December 13, 2006, and granted the State's motion to admit gang-related evidence.[3]

¶19 At trial, the State called Tacoma Police Detective John Ringer to give expert testimony on street gangs. Ringer testified about the horizontal structure of a gang, stating that while there is no absolute leader, certain members have more stature than others. He stated that a gang member can advance in leadership or status by earning respect, either by having drug connections or through a willingness to pull out a gun and shoot. In contrast, Ringer explained, a gang member who is unwilling to participate in the drug trade or use a firearm may be beaten out of the gang and forbidden from entering the neighborhood.

¶20 Detective Ringer also testified about how gang members use tattoos, bandanas, graffiti, hand signs, and other gang insignia to indicate their allegiance to a gang. He

---

[3] The trial court's order admitting gang-related evidence also allowed the State to present evidence that the two rival gangs had had an altercation at the King Oscar Hotel that took place before the July 4, 2006 incident at the Tacoma waterfront, but the State chose not to present this evidence at trial.

testified that gang members frequently wear a bandana of a particular color to show with whom they are associated; Crips are generally associated with the color blue and Bloods with the color red. He stated that gang members may also use hand signs to show disrespect to a rival gang. He also testified that it is important for a gang member to keep the respect of his fellow gang members by not allowing another gang to show disrespect to his gang. As such, Ringer explained, violence between rival gangs is extremely common and frequently involves gunfire, at times with innocent bystanders caught in the cross-fire. He stated that a gang member firing on a rival gang member expects the rival to shoot back.

¶21 Detective Ringer further testified about the history of the Crips, Bloods, and Folks gangs and that, in his opinion, Yarbrough was a member of the 23rd Street Hilltop Crips, probably in the Trafton block clique. He testified that the statement "[W]hat's up, cuz" said to a rival gang member is a sign of disrespect because "cuz" is a term that Crips use to refer to one another. 6 RP at 887. Ringer explained that a Crips member frequently utters this phrase just before shooting at a Blood or Folk just as a Blood member would yell, "[W]hat's up, Bloods" before firing on a Crip. 6 RP at 887.

¶22 A jury found Yarbrough guilty of first degree murder by extreme indifference, first degree assault, and second degree unlawful possession of a firearm. The jury also returned a special verdict finding that Yarbrough committed both the first degree murder and first degree assault to obtain or maintain his membership or to advance his position in the hierarchy of an organization, association, or identifiable group, and that both these offenses involved a destructive and foreseeable impact on persons other than the victim.

¶23 The trial court imposed an exceptional sentence of 120 months above the standard range on the first degree murder conviction for a total period of confinement of 481 months. The trial court also imposed a high-end standard

range sentence of 123 months on the first degree assault conviction, to run consecutively, as well as 16 months on the unlawful possession of a firearm conviction, to run concurrently. The trial court further imposed a total of 120 months flat time for the two firearm enhancements, to run consecutively to the base sentence. The trial court imposed a total sentence of 724 months incarceration.

¶24 Yarbrough timely appeals his conviction and sentence.

## ANALYSIS

GANG-RELATED EVIDENCE

¶25 Yarbrough argues that the trial court erred by admitting gang-related evidence in violation of ER 404(b). The State argues that the gang-related evidence was permissible under ER 404(b) because the gang-related evidence was relevant to prove Yarbrough's motive and his mental state as to the first degree murder by extreme indifference and first degree assault charges. We agree with the State.

¶26 We will not disturb a trial court's ruling under ER 404(b) absent a manifest abuse of discretion such that no reasonable judge would have ruled as the trial court did. *State v. Mason*, 160 Wn.2d 910, 933-34, 162 P.3d 396 (2007), *cert. denied*, 553 U.S. 1035 (2008). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

¶27 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. ER 404(b). Gang evidence falls within the scope of ER 404(b). *See State v. Boot*, 89 Wn. App. 780, 788-89, 950 P.2d 964, *review denied*, 135 Wn.2d 1015 (1998). It may be admissible for other purposes, such as proof of motive, intent, or identity, but before a trial court may admit such evidence, it must (1)

find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002). "ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)).

¶28 Yarbrough argues that the trial court erred in applying the third and fourth requirements under ER 404(b). Yarbrough specifically argues that the gang-related evidence at issue was not relevant to prove any essential element of first degree murder by extreme indifference or first degree assault and the gang-related evidence was more prejudicial than probative.

¶29 In its written order, the trial court found that the gang-related evidence was admissible to prove (1) motive for the alleged crimes, (2) the required mental states for first degree murder and assault, and (3) the identity of the shooter.

MOTIVE AND REQUIRED MENTAL STATES

A. FIRST DEGREE MURDER BY EXTREME INDIFFERENCE

¶30 To convict Yarbrough of first degree murder by extreme indifference, the State had to prove beyond a reasonable doubt that Yarbrough (1) acted with extreme indifference, an aggravated form of recklessness, which (2) created a grave risk of death to others, and (3) caused the death of a person. RCW 9A.32.030(1)(b);[4] *State v. Pastrana*,

---

[4] RCW 9A.32.030 states in pertinent part:

94 Wn. App. 463, 470, 972 P.2d 557, *review denied*, 138 Wn.2d 1007 (1999). Yarbrough contends that the gang-related evidence is not relevant to prove motive because motive is not an element of first degree murder by extreme indifference. But it is well established that the State can prove motive even when it is not an element of the crime charged. *See State v. Athan*, 160 Wn.2d 354, 382, 158 P.3d 27 (2007) ("Although motive is not an element of murder, it is often necessary when only circumstantial evidence is available."); *State v. Young*, 87 Wn.2d 129, 138, 550 P.2d 1 (1976) (although not an element of crime of arson, presence of a likely motive was a circumstance which the jury could consider along with other circumstances in the case). In *Boot*, Division Three of this court reasoned that "[a]lthough the State is not required to prove motive as an element of the offense, evidence showing motive may be admissible" if "the evidence is relevant and necessary to prove an essential element of the crime charged." 89 Wn. App. at 789.

¶31 In *Boot*, evidence of the defendant's gang affiliation was admissible under ER 404(b) to prove motive because "[t]he testimony on gangs established that killing someone heightened a gang member's status" and "[t]he evidence show[ed] the context in which the murder was committed." 89 Wn. App. at 789. Similarly, we held gang evidence admissible under ER 404(b) to establish motive in *State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050, *review denied*, 128 Wn.2d 1004 (1995), because the "challenged evidence clearly was highly probative of the State's theory—that [the defendant] was a gang member who responded with violence to challenges to his status and to invasions of his drug sales territory." Yarbrough argues that *Boot* and *Campbell* are not controlling because both deal with first degree murder by premeditation where the State was required to prove intent, rather than by murder by

---

(1) A person is guilty of murder in the first degree when:
. . . .
    (b) Under circumstances manifesting an extreme indifference to human life, he or she engages in conduct which creates a grave risk of death to any person, and thereby causes the death of a person.

extreme indifference.[5] But "motive" is not synonymous with "intent." *State v. Tharp*, 27 Wn. App. 198, 207-08, 616 P.2d 693 (1980), *aff'd*, 96 Wn.2d 591, 637 P.2d 961 (1981). "Intent" is the "mental state with which the criminal act is committed." *Tharp*, 27 Wn. App. at 208. "Motive" is an "inducement which tempts a mind to commit a crime." *Boot*, 89 Wn. App. at 789. Here, that Yarbrough belonged to a gang and perceived Simms to be associated with a rival gang is relevant to establish an inducing cause for Yarbrough to act with extreme indifference by shooting at Simms only a few days after the two gangs had had a prior altercation. As the trial court noted when Yarbrough argued his motion to exclude the gang-related evidence,

> [the gang-related] evidence is not being introduced to show that [Yarbrough] is a criminal-type or a bad guy, but it's simply to show that as a member of an organization which apparently had hard feelings toward a different organization and the victim was a member of the different organization, . . . that of itself would provide an explanation why somebody would do [something] otherwise as inexplicable, if for no other reason, shooting somebody.

RP (Dec. 13, 2006) at 18-19.

¶32 The gang-related evidence was also highly probative of the State's theory of the case and the aggravating circumstance that Yarbrough murdered Simms to advance his position in his gang. Additionally, the gang-related evidence showed the context in which the murder was committed.

¶33 In addition to its relevance to establish motive, the gang-related evidence at issue was also admissible under ER 404(b) to establish the requisite mental state for a first

---

[5] Yarbrough also urges this court to overturn *Boot* and *Campbell*. But Yarbrough fails to demonstrate that the rule set forth in *Boot* and *Campbell*, that gang-related evidence is admissible to establish motive under ER 404(b) in a first degree murder trial, is incorrect. *See State v. Devin*, 158 Wn.2d 157, 168, 142 P.3d 599 (2006) (" 'The doctrine of stare decisis requires a clear showing that an established rule is incorrect and harmful before it is abandoned.' " (internal quotation marks omitted) (quoting *Riehl v. Foodmaker, Inc.*, 152 Wn.2d 138, 147, 94 P.3d 930 (2004))). We decline to abandon the precedent of *Boot* and *Campbell*.

degree murder by extreme indifference conviction. Yarbrough argues that the State can establish the requisite mental state of "acting with extreme indifference" solely by an examination of the means employed to commit a murder. It is true that a jury can infer Yarbrough's mens rea of acting with extreme indifference through evidence of the means employed to commit murder. *See Pastrana*, 94 Wn. App. at 473 (evidence was sufficient to establish that defendant, who fired a single bullet at a specific vehicle, acted with extreme indifference because his conduct put other drivers and passengers on crowded freeway in danger); *State v. Berge*, 25 Wn. App. 433, 437, 607 P.2d 1247 (evidence not sufficient to establish extreme indifference where defendant fired 30 shots into a single victim sleeping on a couch), *review denied*, 94 Wn.2d 1016 (1980). But although a jury may properly rely solely on this type of evidence, it does not follow that the State is precluded from offering additional relevant evidence to establish that Yarbrough acted with extreme indifference. This is particularly apparent here when considering the expert testimony that a gang member "knows that when shots are fired toward another gang, the other gang is more than likely to fire right back, or retaliate [o]n short notice." 6 RP at 888. Moreover, this sort of evidence may be necessary to establish the mental state of extreme indifference in a situation, for example, where a defendant is standing on a crowded side of a street and fires at a single person on the other side of the street, with knowledge that the victim is armed and likely to return fire on the crowd.

¶34 While we acknowledge the prejudicial nature of gang-related evidence to Yarbrough's defense, on balance, the gang-related evidence is not unduly prejudicial and is probative evidence of the State's legitimate theory of the case and the circumstances surrounding the crime. In *State v. Elmore*, 139 Wn.2d 250, 285, 985 P.2d 289 (1999), *cert. denied*, 531 U.S. 837 (2000), our Supreme Court found that it was not an abuse of discretion for the trial court to admit slides depicting an autopsy despite the prejudicial nature of

the evidence. In reaching this conclusion, our Supreme Court reasoned that a defendant may not sanitize the events of a brutal crime by dictating what evidence the State is entitled to present. *Elmore*, 139 Wn.2d at 285. Accordingly, the trial court here did not abuse its discretion in admitting the gang-related evidence under ER 404(b) to establish motive and the requisite mental state necessary to prove first degree murder by extreme indifference.

### B. First Degree Assault

¶35 The gang-related evidence is also admissible to establish a motive for Yarbrough to commit first degree assault. To convict Yarbrough of first degree assault, the State had to prove that Yarbrough (1) intended to inflict great bodily harm and (2) assaulted another with any deadly weapon or by any force or means likely to produce great bodily harm or death. RCW 9A.36.011(1)(a); *State v. Kolesnik*, 146 Wn. App. 790, 803, 192 P.3d 937 (2008), *review denied*, 165 Wn.2d 1050 (2009). Under RCW 9A.36-.011, once the State establishes Yarbrough's intent to inflict great bodily harm, the mens rea is transferred to any unintended victim. *State v. Wilson*, 125 Wn.2d 212, 218, 883 P.2d 320 (1994).

¶36 Here, as in the first degree murder charge, the gang-related evidence was highly probative to establish the inducing cause for Yarbrough to assault another with a deadly weapon because the evidence established that (1) Yarbrough was affiliated with a gang known as the Hilltop Crips; (2) Yarbrough perceived Simms, the intended victim of the assault, to be associated with a rival gang; (3) the rival gangs had had an altercation days before the shooting; and (4) a gang member can elevate his status by being "willing to pull a gun out and shoot." 6 RP at 843.

¶37 Moreover, the gang-related evidence was also relevant to establish Yarbrough's mental state, intent to inflict great bodily injury, which the State was required to prove in order to convict Yarbrough of first degree assault. Our Supreme Court has recognized that " '[e]vidence of in-

tent . . . is to be gathered from *all* of the circumstances of the case, including not only the manner and act of inflicting the wound, but also *the nature of the prior relationship and any previous threats.'*" *Wilson*, 125 Wn.2d at 217 (emphasis added) (second alteration in original) (quoting *State v. Ferreira*, 69 Wn. App. 465, 468, 850 P.2d 541 (1993)). And, although specific intent cannot be presumed, "it can be inferred as a logical probability from all the facts and circumstances." *Wilson*, 125 Wn.2d at 217.

¶38 Here, the State's evidence of Yarbrough's gang affiliation, his perception that the victim was associated with a rival gang, and the two gangs' previous altercation show the circumstances of the assault and the prior relationship between Yarbrough and the victim, including previous threats that were exchanged between Yarbrough's group and the victim's group. The trial court did not abuse its discretion in admitting the gang-related evidence under ER 404(b) to establish motive and the requisite mental state in a first degree assault charge as excluding this evidence would " 'deprive the State of relevant evidence necessary to establish an essential element of its case.' " *Foxhoven*, 161 Wn.2d at 175 (quoting *Lough*, 125 Wn.2d at 859). The admission of gang-related evidence did not deprive Yarbrough of his right to a fair trial, as the evidence was relevant to prove motive and the requisite mental state in both the first degree murder and first degree assault charges, and the evidence was more probative than prejudicial.

IDENTITY

¶39 Yarbrough argues that the gang-related evidence was not admissible under ER 404(b) to prove the identity of the shooter because the similarity between Yarbrough's gang affiliation and the crimes charged did not reach the level of a unique signature. The State did not argue this issue in its brief but contended at oral argument that under *Lough*, the level of similarity between the crime charged and the prior bad acts need not reach the level of a

unique signature. 125 Wn.2d 847. We disagree. Because the gang-related evidence did not demonstrate that the means of committing the crimes was so unique as to constitute a "signature," the trial court erred in admitting the gang-related evidence to establish identity. But we find the error harmless because the gang-related evidence was admissible for a purpose other than to establish identity.

¶40 Here, the trial court found that "the proffered evidence would satisfy the purposes described because proof of [Yarbrough's] gang affiliation, and his motivation to harm perceived rivals, particularly because of earlier altercations, would provide circumstantial proof of his . . . identity as the shooter from a rival gang." CP at 39. Our Supreme Court has distinguished prior bad acts admitted under ER 404(b) for establishing a defendant's modus operandi as opposed to a common plan or scheme. *Foxhoven*, 161 Wn.2d at 175-80; *State v. DeVincentis*, 150 Wn.2d 11, 74 P.3d 119 (2003). And only the modus operandi exception is a permissible use of prior bad acts to establish identity. Our Supreme Court reasoned, "Evidence of unique modus operandi is relevant when the focus of the inquiry is the identity of the perpetrator." *DeVincentis*, 150 Wn.2d at 21. In contrast, "[the common plan or scheme] exception is generally used when the occurrence of the crime or intent are at issue, not when identity is the issue." *Foxhoven*, 161 Wn.2d at 179.

¶41 Evidence admitted under ER 404(b) to establish identity through a unique modus operandi imposes a high burden on the State to demonstrate similarity between the defendant's prior bad acts and the alleged crime at issue. "[W]hen identity is at issue, the degree of similarity must be at the highest level and the commonalities must be unique because the crimes must have been committed in a manner to serve as an identifiable signature." *DeVincentis*, 150 Wn.2d at 21 (citing *Thang*, 145 Wn.2d at 643).

¶42 Here, the State did not show that the means of committing the first degree murder by extreme indifference and first degree assault were sufficiently similar to Yarbrough's activities as a gang member to establish an identi-

fiable signature. The State's reliance on *Lough* is misplaced because the ER 404(b) evidence in *Lough* was admitted under the common plan or scheme exception to establish the criminal act charged, not under the modus operandi exception to prove the defendant's identity. 125 Wn.2d at 855-61. The trial court erred when it admitted gang-related evidence under ER 404(b) to establish the shooter's identity. But the error is harmless because the gang-related evidence was properly admitted to establish Yarbrough's motive and mental state. "An evidentiary error is not of constitutional magnitude and is prejudicial only if 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " *State v. Brockob*, 159 Wn.2d 311, 351, 150 P.3d 59 (2006) (internal quotation marks omitted) (quoting *State v. Bourgeois*, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997)).

INEFFECTIVE ASSISTANCE OF COUNSEL

¶43 Next, Yarbrough argues that his trial counsel was ineffective by failing to request a limiting instruction regarding the gang-related evidence and by failing to object to Detective Ringer's expert testimony concerning gangs. We disagree.

¶44 We review an ineffective assistance of counsel claim de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995), *review denied*, 129 Wn.2d 1012 (1996). Effective assistance of counsel is guaranteed by both United States Constitution amendment VI and Washington Constitution article I, section 22. *State v. Hendrickson*, 129 Wn.2d 61, 77, 917 P.2d 563 (1996) (citing *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

¶45 To establish ineffective assistance, Yarbrough must show that (1) defense counsel's performance was deficient and (2) this performance prejudiced him. *Strickland*, 466 U.S. at 687. Deficient performance occurs when counsel's performance falls below an objective standard of reason-

ableness. *State v. Horton,* 116 Wn. App. 909, 912, 68 P.3d 1145 (2003). Prejudice occurs when, but for the deficient performance, there is a reasonable probability that the outcome would have differed. *In re Pers. Restraint of Pirtle,* 136 Wn.2d 467, 487, 965 P.2d 593 (1998). To prevail on a claim of ineffective assistance of counsel, the defendant must overcome a strong presumption that defense counsel was effective. *State v. McFarland,* 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). "If trial counsel's conduct can be characterized as legitimate trial strategy or tactics, it cannot serve as a basis for a claim that the defendant received ineffective assistance of counsel." *State v. McNeal,* 145 Wn.2d 352, 362, 37 P.3d 280 (2002) (citing *State v. Adams,* 91 Wn.2d 86, 90, 586 P.2d 1168 (1978)).

## A. FAILURE TO REQUEST A LIMITING INSTRUCTION

¶46 At a December 13, 2006 pretrial hearing, the trial court granted the State's motion to admit gang-related evidence and ruled that it would be "prepared to sign an appropriate limiting instruction in order to reduce the risk of unfair prejudice." CP at 39. Defense counsel, however, did not propose such an instruction and Yarbrough claims this constitutes deficient performance. But prior cases have established that failure to request a limiting instruction for evidence admitted under ER 404(b) may be a legitimate tactical decision not to reemphasize damaging evidence. *See State v. Price,* 126 Wn. App. 617, 649, 109 P.3d 27 ("[w]e can presume that counsel did not request a limiting instruction" for ER 404(b) evidence to avoid reemphasizing damaging evidence), *review denied,* 155 Wn.2d 1018 (2005); *State v. Barragan,* 102 Wn. App. 754, 762, 9 P.3d 942 (2000) (failure to propose a limiting instruction for the proper use of ER 404(b) evidence of prior fights in prison dorms was a tactical decision not to reemphasize damaging evidence); *State v. Donald,* 68 Wn. App. 543, 551, 844 P.2d 447, *review denied,* 121 Wn.2d 1024 (1993). Yarbrough does not attempt to distinguish these cases. We presume, therefore, that Yarbrough's trial counsel decided not to request a limiting

instruction on the gang-related evidence as a legitimate trial strategy not to reemphasize damaging evidence. And a legitimate trial strategy or tactic cannot serve as a basis for an ineffective assistance of counsel claim. *McNeal*, 145 Wn.2d at 362.

### B. FAILURE TO OBJECT TO EXPERT TESTIMONY

¶47 Yarbrough also argues that his defense counsel was ineffective for failing to object to Detective Ringer's expert testimony. But Yarbrough's defense counsel objected to the admission of gang-related evidence at the December 13, 2006 pretrial hearing. Yarbrough asserts that the State did not disclose Ringer as a potential witness until December 15, 2006, and, thus, the expert testimony was not subject to defense counsel's objection to gang-related evidence at the December 13 pretrial hearing. Although defense counsel was not aware of precisely who would be testifying as the State's expert witness on gangs, he was aware that his objection encompassed the State's offer of expert testimony on street gangs. This is evident from statements the State and defense counsel both made at the December 13 pretrial hearing.

¶48 At the December 13 pretrial hearing, the State outlined the gang evidence that it sought to introduce at trial, including "expert testimony that would tie together these pieces of information for the jury's benefit to help them understand [Yarbrough's] gang involvement and that this case is quite plainly a gang-related case." RP (Dec. 13, 2006) at 7. Defense counsel acknowledged that expert testimony was the subject of the State's previous motion to admit when, on a later motion, he commented, "I presume this is going to be similar to those trials where there will be a gang expert on the stand who is going to talk about how gangs operate, how they use force, threats of violence." RP (Dec. 13, 2006) at 24. Because defense counsel likely believed that expert testimony regarding gangs was a subject of the trial court's order admitting gang-related evidence, it was reasonable for Yarbrough's defense counsel not to object to the State's expert witness a second time.

¶49 Yarbrough also argues that his defense counsel was ineffective for failing to object to certain aspects of Detective Ringer's expert testimony, claiming that this testimony violated ER 704. Specifically, Yarbrough argues that Ringer's testimony constituted impermissible "profile" or "pattern" opinion testimony and/or an improper opinion as to Yarbrough's guilt.

¶50 At trial, the State asked Detective Ringer to assume certain hypothetical facts, which included assumptions that (1) Yarbrough was a member of the Hilltop Crips; (2) Yarbrough believed Simms to be a member of the 96th Street Murderville Folks; (3) the two groups had a confrontation days before the shooting; (4) moments before Yarbrough fired, he, or members of his group, yelled, "[W]hat's up, cuz, this is Hilltop Crips," 6 RP at 886; (5) Yarbrough fired at his perceived rivals; (6) one of the perceived rivals fired in response; (7) a round from the rival gunfire struck a young woman; and (8) Yarbrough's group fled to a gas station. The State then questioned Ringer based on these hypothetical facts:

[Q] Now, Detective, based on these hypothetical facts, do you have an opinion, to a reasonable degree of certainty, as a gang expert, whether this scenario appears to you to be a gang motivated shooting?

A From what I know, considering the hypothetical facts, all indications is, you have two different gangs squaring off, insulting each other, and it escalated to the point that where a shooting would be not out of the ordinary.

Q Based on the hypothetical facts that I have described for you, do you have an opinion to a reasonable degree of certainty as to whether [Yarbrough] by shooting at his perceived rivals would be maintaining, or advancing his position, in the hierarchy of the Hilltop Crips?

A By the actions described, what I know, including the insults, and it is an insult to call a rival gang, what's up, cuz, followed by shots, definitely a person is building their reputation, building their status.

. . . .

Q  Having these hypothetical facts in mind, do you have an opinion, again to a reasonable degree of certainty, whether it would be reasonable for [Yarbrough] to expect return fire from across the street?

A  A person who is [immersed] in a gang culture, knows that when shots are fired toward another gang, the other gang is more than likely to fire right back, or retaliate [o]n short notice. It's a fact of life under gang culture. We see it time and time again.

Q  Finally, under these hypothetical facts to a certain degree of certainty, that it would be reasonable for [Yarbrough] to foresee that a third party could be caught in a cross fire and be struck by a bullet and harmed?

A  Again, there is enough common knowledge on the street among the gangs of multiple instances where innocent parties are hit. You know, you can go up and talk with any gang member and they can tell you, yeah, you know, at this particular time somebody was cruising through. They know the name, and got hit. Got caught in a cross fire. You know, it's in the lingo. It is openly known that innocent people commonly get shot as a result of these kind of things.

Q  So that would be reasonably foreseeable for [Yarbrough] to know that under these hypothetical facts?

A  I believe so.

6 RP at 886-89.

¶51 Generally, "no witness, lay or expert, may 'testify to his opinion as to the guilt of a defendant, whether by direct statement or inference.' " *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993) (quoting *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987)), *review denied*, 123 Wn.2d 1011 (1994). Such testimony is prejudicial because it " 'invad[es] the exclusive province of the finder of fact.' " *Heatley*, 70 Wn. App. at 577 (alteration in original) (quoting *Black*, 109 Wn.2d at 348). But opinion testimony is not improper when it does not directly comment on the defendant's guilt, is otherwise helpful to the jury, and is based on reasonable inferences from the evidence. *Heatley*, 70 Wn. App. at 578.

¶52 Here, Detective Ringer did not directly testify that, in his opinion, Yarbrough was guilty of any of the crimes or aggravating circumstances charged. Although, when accepting the State's hypothetical facts, Ringer gave his opinion on the ultimate issue of aggravating circumstances (if Yarbrough shot a perceived rival, would it advance his position in an organization and whether his crime involved a foreseeable impact on persons other than the victim), the jury was still left to decide whether to find Ringer's testimony credible and whether the hypothetical facts underlying Ringer's opinion were present in Yarbrough's case. ER 704 provides that "[t]estimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." And Ringer's testimony was "otherwise admissible" because he was clearly qualified as a gang expert given his extensive training and years of experience and his testimony was helpful to the jury as it provided the context for the admitted gang-related evidence.

¶53 Because Detective Ringer's testimony did not violate ER 704, defense counsel was not ineffective for failing to object on this basis.

DOUBLE JEOPARDY

¶54 Yarbrough argues that the trial court violated his right to be free from double jeopardy when it imposed an exceptional sentence on his first degree murder conviction based on the aggravating factor that the murder involved a destructive and foreseeable impact on persons other than the victim. Yarbrough specifically argues that RCW 9A-.32.030(1)(b) and RCW 9.94A.535(3)(r) violate the double jeopardy clause because they punish a criminal defendant twice for the same conduct. We disagree.

¶55 The United States Constitution provides that a person may not be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. And the Washington State Constitution provides that a person may not be "twice put in jeopardy for the same

offense." WASH. CONST. art. I, § 9. This provision of the Washington State Constitution provides the same protection against double jeopardy as the Fifth Amendment to the federal constitution. *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 815, 100 P.3d 291 (2004). Because Yarbrough's double jeopardy challenge does not involve the consequences of a prior trial, we examine only whether the legislature intended to authorize multiple punishments under RCW 9.94A.535. *State v. Calle*, 125 Wn.2d 769, 776, 888 P.2d 155 (1995) (Appellate review on double jeopardy claim is "limited to assuring that the court did not exceed its legislative authority by imposing multiple punishments for the same offense."); *State v. Truong Nguyen*, 134 Wn. App. 863, 868, 142 P.3d 1117 (2006) ("unless the question involves the consequences of a prior trial, double jeopardy analysis is an inquiry into legislative intent"), *review denied*, 163 Wn.2d 1053, *cert. denied*, 129 S. Ct. 644 (2008). We review double jeopardy claims de novo. *State v. Freeman*, 153 Wn.2d 765, 770, 108 P.3d 753 (2005).

¶56 Yarbrough argues that the "same evidence" test compels us to find that the crime of first degree murder by extreme indifference, RCW 9A.32.030(1)(b), and the aggravating factor under RCW 9.94A.535(3)(r) are the same in law and fact and, therefore, violate the double jeopardy clause of the state and federal constitutions. But the "same evidence" test does not apply here. In order to apply the "same evidence" test, we must first find that RCW 9A.32.030(1)(b) and RCW 9.94A.535(3)(r) do not expressly allow multiple punishments for the same act or transaction. *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006). And the plain language under RCW 9.94A.535(3) clearly shows the legislature's intent to allow a sentencing court to enhance a defendant's sentence if a jury finds one or more circumstances are present from "an exclusive list of factors that can support a sentence above the standard range."

¶57 Numerous Washington cases have held that sentencing enhancements do not violate the double jeopardy clause even when the enhancement constitutes an element

of the underlying conviction. *See State v. Kelley*, 146 Wn. App. 370, 374-75, 189 P.3d 853 (2008), *review granted*, 165 Wn.2d 1027 (2009); *State v. Tessema*, 139 Wn. App. 483, 493, 162 P.3d 420 (2007), *review denied*, 163 Wn.2d 1018 (2008); *Nguyen*, 134 Wn. App. at 866; *State v. Caldwell*, 47 Wn. App. 317, 319, 734 P.2d 542, *review denied*, 108 Wn.2d 1018 (1987); *State v. Pentland*, 43 Wn. App. 808, 811, 719 P.2d 605, *review denied*, 106 Wn.2d 1016 (1986). Although these cases deal with the sentencing enhancement of being armed with a deadly weapon while committing the underlying offense, the same principles should apply to the enhancement of committing an offense that involves a "destructive and foreseeable impact on persons other than the victim" because the legislature clearly authorized additional punishment under either aggravating factor. RCW 9.94A.535(3)(r).

SUFFICIENCY OF THE EVIDENCE

¶58 Yarbrough argues that sufficient evidence does not support the trial court's imposition of an exceptional sentence because the evidence failed to establish that Yarbrough committed any crime for purposes of advancing or maintaining his position in an identifiable group. We disagree.

¶59 In determining whether sufficient evidence supports a conviction, "[t]he standard of review is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990) (citing *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980)). A claim of insufficiency admits the truth of the State's evidence and all reasonable inferences drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Circumstantial evidence and direct evidence are equally reliable for purposes of drawing inferences. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

¶60 Under RCW 9.94A.535(3)(s), the State had to present evidence to support the jury's finding that Yarbrough com-

mitted the first degree murder and first degree assault to "obtain or maintain his . . . position in [an] identifiable group." Here, Yarbrough concedes that the State presented sufficient evidence to prove that he was in a gang. But Yarbrough argues that sufficient evidence does not establish that his motive in shooting Simms was to advance his position in a gang. Here, the State presented evidence that (1) Yarbrough was a member of the Hilltop Crips; (2) Yarbrough perceived Simms as associated with a rival gang, the 96th Street Murderville Folk; (3) these two gangs had a confrontation on July 4, 2006, where someone from the Hilltop Crips threatened to "bust" if there hadn't been a nearby police presence, 3 RP at 400; and (4) Yarbrough shot Simms after uttering, "This is Hilltop Crip, cuz, what you know about that." 3 RP at 460. The State's expert witness, Detective Ringer, testified that calling a rival gang member "cuz" is an insulting challenge and a warning that gunfire may soon erupt. 6 RP at 887. Ringer also testified that gang members gain status within the gang by being willing to engage in gunplay to defend the gang's honor, while someone who is perceived as unwilling to defend his "home boys" may be kicked out. 6 RP at 844. Any reasonable jury could infer from this evidence that Yarbrough committed the murder and assault to advance or maintain his position in his gang. Yarbrough's argument thus rests on his contention that Ringer's expert opinion testimony was inadmissible. But Yarbrough waived this contention when he did not object below. Moreover, as we addressed above, Ringer's testimony would likely have been admissible notwithstanding an objection. Sufficient evidence supports the jury's finding that Yarbrough committed the murder and assault to advance or maintain his position in an identifiable group.

CUMULATIVE ERROR

¶61 Yarbrough argues that cumulative error deprived him of his right to a fair trial. The cumulative error doctrine applies when several errors occurred at the trial court level, but none alone warrants reversal. *State v. Hodges*, 118 Wn.

App. 668, 673, 77 P.3d 375 (2003), *review denied*, 151 Wn.2d 1031 (2004). Instead, the combined errors effectively denied the defendant a fair trial. *Hodges*, 118 Wn. App. at 673-74. The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964, *cert. denied*, 513 U.S. 849 (1994).

¶62 Because the only error here was the trial court's admission of gang-related evidence under ER 404(b) to prove identity, and this error was harmless because the gang-related evidence was properly admitted for another purpose, Yarbrough has failed to meet his burden of demonstrating an accumulation of error warranting reversal. Accordingly, we affirm.

ARMSTRONG, J., concurs.

¶63 PENOYAR, A.C.J. (concurring) — I agree with the majority except for its discussion of the trial court's decision to admit evidence of Yarbrough's gang affiliation.

¶64 The majority correctly concludes that this evidence was admissible to establish motive and the requisite mental state. I would end the analysis there and not proceed to analyze whether the same evidence might also be admissible to prove Yarbrough's identity.