# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON | ) | No. 72627-7-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| LUIS ALBERTO VELA, | ) | |
| | ) | |
| Appellant. | ) | FILED: April 18, 2016 |
| | ) | |

APPELWICK, J. — A jury convicted Vela of assaulting and unlawfully imprisoning his girlfriend. He challenges the trial court's admission of prior acts of domestic violence and his counsel's failure to request a limiting instruction for that evidence. We affirm.

## FACTS

Based on allegations that Vela threatened Veronica Lopez-Nunez with a knife, physically assaulted her, and held her against her will, the State charged him with three crimes of domestic violence: second degree assault while armed with a deadly weapon, third degree assault, and unlawful imprisonment.

Prior to trial, the State moved to admit evidence of Vela's prior domestic abuse of Veronica under ER 404(b). That evidence included controlling behavior, threats of deportation, threats to kill, and sexual mutilation of a prior girlfriend. Because Veronica's "reasonable apprehension and imminent fear of

bodily injury" were at issue in the second degree assault count, the State argued that the "reasonableness of her fear could only be evaluated in light of the domestic abuse she had suffered at [Vela's] hands." The State also maintained the prior abuse was relevant to whether Vela unlawfully restrained Veronica by force, intimidation, or deception on the unlawful imprisonment count. Last, the State claimed the evidence was relevant to Veronica's credibility because it explained why she stayed with Vela, delayed reporting the abuse, and made excuses for her bruises.

The defense opposed the motion, arguing that "[t]he assaults are predicated upon completed unlawful touching" and therefore the prior abuse was not relevant since no showing of reasonable apprehension or fear was required. The defense claimed Veronica's credibility was not at issue because she never recanted her story. It further claimed that the evidence was inadmissible in any event absent an expert to explain the dynamics of domestic violence for the jury. In his trial brief, defense counsel stated that if the court admitted the evidence it should give a limiting instruction "that the evidence is admitted only for the limited purpose of explaining the relationship between Ms. Nunez and Mr. Vela."

The court granted the State's motion in part, stating:

> . . . the deportation allegations, the following her within the apartment and without, refusing to permit her to have a cell phone, keeping her in the bedroom . . . are pretty clearly, I think, 404(b), and they address the elements the State has to prove, which is whether or not she felt intimidated, whether she would report the assault, the deportation threat being the overarching one, together with any further violence.

2

> I'm not persuaded that assault of another girlfriend overcomes the prejudicial factors. But assaults which may have occurred [in] February and March, I am amenable to permitting.

The court ruled that expert testimony was not necessary to admit the domestic violence evidence, stating, "I don't think there's case law . . . that requires that . . . the evidence be rejected just because there's no expert to testify about the dynamics of domestic violence."

At trial, Veronica testified that she met Vela on a dating website in early 2013. As their relationship became romantic, Vela began spending time at Veronica's apartment with her and her teen-age daughters, J.C. and W.C.[1] He also exerted increasing control over her activities. On several occasions, Vela slept in his car in the apartment parking lot "[b]ecause he thought I would go . . . out somewhere and that I was lying to him when I told him that I had to be with my daughters." He also convinced Veronica to quit her weekend house-cleaning job so she could spend more time with him. She eventually quit her primary job at Overlake Hospital because Vela did not like her interacting with men during the workday.

One month into the relationship, Vela borrowed Veronica's cell phone. When she asked him to give it back, he refused, saying she did not need it. When she used her daughters' phones, he struck her.

By April 2013, Vela had partially moved into Veronica's apartment and was becoming more abusive. She could not use a telephone without telling Vela who she was calling and asking for permission. She also needed permission to

---

[1] Veronica's daughters were 15 and 13 years old when trial commenced in August 2014.

bathe, leave her bedroom, or leave the apartment. If she violated Vela's rules, he hit her, sometimes leaving bruises on her stomach and arms. At one point, he threatened to kill her and dump her body in Lake Washington. He also threatened to have someone beat up her family. Veronica testified that she did not call the police because she "was very afraid of what he could do to [her]." She added that Vela was careful not to display his anger around her daughters.

Veronica testified that on April 30, 2013, J.C. stated in Vela's presence that Veronica's brother had called her about a message Veronica had left him. That night, Vela ordered Veronica to strip and stand naked in front of the bedroom window until he said otherwise. He told her that if she sat or laid down, things would "go badly" for her. Veronica stood naked at the window the entire night. This incident resulted in the unlawful imprisonment charge.

The next morning, Vela beat Veronica, telling her it was her fault for not listening to him. He retrieved a steak knife from the kitchen and put it slightly inside Veronica's vagina. He threatened to fully insert it, saying that it would not hurt him at all. This incident was the basis for the second degree assault charge.

The next time Vela visited Veronica, he put a gun to her head and inside her mouth. He was upset that she wanted to end their relationship and said he could kill her and her daughters and no one would ever know. He later instructed Veronica to put the gun away in her apartment.

On May 5, 2013, Veronica told Vela in front of her daughters that she had used J.C.'s cell phone to check the balance on a food stamp card. Fearing what Vela might do to her behind closed doors, Veronica gathered all the scissors and

knives in the kitchen and hid them in a laundry hamper. She also moved his gun from her bedroom to a hallway closet.

Vela subsequently ordered Veronica to go to her bedroom. He joined her there and demanded his gun. Veronica said it was in the hallway and offered to get it. When she left the bedroom, she told J.C. to call the police. She then gave Vela the gun in a plastic bag. He proceeded to pour his beer on her head and beat her with the bottle.

Police arrived a short time later and told Veronica to open the bedroom door. As she walked toward the door, she heard the rustling of a plastic bag. Officers entered the room and arrested Vela but did not see a gun. They later found it, along with some ammunition, in a plastic bag on the lawn below Veronica's bedroom window.

The arresting officers testified that Veronica was "obviously distressed and upset." They saw redness and swelling on her face and neck, bruises on her upper left arm, and a scratch or scar on her lower left arm. Her hair was wet and appeared to be missing from a portion of her scalp. The officers found scissors and kitchen knives in a hamper in the girls' bedroom.

L.C. and W.C. corroborated Veronica's testimony about Vela's controlling behavior. They testified that Vela usually kept her in the bedroom and accompanied her whenever she came out. When the girls asked about bruises or scratches on their mother's arms, Veronica told them they were injuries from work. L.C. testified that on May 5, 2013, her mother asked her to call 911 shortly

after Vela entered the apartment. L.C. said her mother seemed scared. Neither L.C. nor W.C. saw or heard Vela hitting or threatening their mother.

Vela testified in his own defense and denied assaulting, threatening, or controlling Veronica. He claimed that their relationship was purely sexual, that they mutually decided to spend most of their time in her bedroom, and that he kept her cell phone because they agreed to keep each other's phones. He admitted sleeping in his car in the apartment parking lot several times, but claimed he did so out of respect for Veronica's daughters.

Vela testified that he tried to end the relationship multiple times, but ended up staying because Veronica threatened to hurt herself. On one occasion, she intentionally cut her arm with some glass when he said he was leaving her. Another time, she reacted by cutting herself with a knife.

Vela claimed Veronica's injuries on the day of his arrest were self-inflicted or accidental. He testified that he told Veronica the relationship was over and she began drinking a beer while he packed his clothes. He told her, "Please understand me, don't drink for that" and tried to take the beer from her. In the struggle over the beer, Veronica spilled it on her head and struck herself in the face with her own hand. Veronica then said if she could not have Vela, no one could. At that point, Vela threw his gun out the window to prevent Veronica from grabbing it.

Vela testified that the scratch officers observed on Veronica's arm was a self-inflicted response to his attempt to end the relationship. Similarly, he claimed that the bruises on her arm were inflicted when he tried to stop her from

6

cutting herself. He denied pulling Veronica's hair and claimed she pulled it herself out of anger. He also claimed that Veronica hid the kitchen knives because he conditioned the continuation of their relationship on her putting all the knives away.

On cross-examination, Vela conceded that despite his concerns that Veronica would harm herself, he left his gun with her. He also conceded that he did not throw the gun out the window until the police knocked on the door and announced their presence. On redirect, however, he said he threw the gun out before the police arrived.

The jury found Vela guilty as charged. He appeals.

## DISCUSSION

Vela contends the trial court abused its discretion in admitting his prior acts of domestic violence under ER 404(b). We review a court's decision to admit or exclude such evidence for abuse of discretion. State v. Magers, 164 Wn.2d 174, 181, 189 P.3d 126 (2008). A court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds. Id. The trial court did not abuse its discretion.

ER 404(b) limits the admission of prior bad acts:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

This rule bars the use of prior bad acts for the purpose of proving a person's character and action in conformity with that character. State v. Gresham, 173

Wn.2d 405, 420, 269 P.3d 207 (2012). However, the rule permits the admission of such acts for purposes listed in the rule or approved by the courts. State v. Cook, 131 Wn. App. 845, 847, 129 P.3d 834 (2006) ("The permitted purposes listed in the rule are not exclusive), overruled on other grounds by Magers, 164 Wn.2d 185.

Our courts have admitted prior acts of domestic violence under ER 404(b) for a number of purposes. They include assisting the jury in assessing the credibility of a victim who recants or makes inconsistent statements, showing the reasonableness of a victim's fear where fear is an element of the charged offense, and explaining the victim's delayed reporting of an offense. Magers, 164 Wn.2d at 186 (acts of domestic violence admissible to show victim's reasonable fear and to judge credibility of a recanting victim); State v. Gunderson, 181 Wn.2d 916, 925, 337 P.3d 1090 (2014) (prior acts admissible when "the State has established their overriding probative value, such as to explain a witness's otherwise inexplicable recantation or conflicting account of events."); State v. Baker, 162 Wn. App. 468, 474-75, 259 P.3d 270 (2011) (prior acts of domestic violence admissible to assist jury in assessing credibility of victim who delays reporting or changes her story). Vela claims that, contrary to the trial court's conclusions, none of these purposes apply in this case. We disagree.

Vela's prior acts of domestic violence were properly admitted to explain Veronica's inconsistent statements regarding her bruises. Veronica told at least one of her daughters that her bruises were from work injuries, but then testified that they were actually a result of Vela's physical abuse. Citing Gunderson, Vela

8

contends prior domestic violence is only admissible to explain conflicts between a victim's testimony and other formal statements, such as prior statements to police or a prosecutor. Because this case involved a conflict between Veronica's testimony and *her daughter's* testimony about Veronica's out-of-court statement, Vela claims his prior acts were not admissible under Gunderson. Nothing in Gunderson supports this claim.

Gunderson held that prior acts of domestic violence were not admissible to explain a conflict between a victim's statement and "other evidence *from a different source.*" Gunderson, 181 Wn.2d at 924 (emphasis added). Where, however, a victim gives inconsistent accounts on or off the witness stand, then prior acts of domestic violence are admissible. Id. at 924 n.2, 925. Gunderson does not require that the inconsistent accounts be given in formal statements or testimony. Because Veronica gave inconsistent accounts of her bruises, Vela's prior acts of domestic violence were admissible to explain the inconsistency.

Vela's prior domestic violence was also admissible to explain Veronica's delay in reporting and her continuation of the relationship after the events of April 30, 2012. Baker, 162 Wn. App. at 475 (delay in reporting); Gunderson, 181 Wn.2d at 924 n.2 (continuation of the relationship after domestic violence). Citing State v. Fisher, 165 Wn.2d 727, 745-46, 202 P.3d 937 (2009), Vela contends his prior acts were admissible to explain Veronica's delayed reporting *only* if the defense first made an issue of the delay. He misreads Fisher.

Fisher upheld a trial court's ruling that prior physical abuse "was admissible conditioned upon the defense's making an issue of [the victim's]

9

delayed reporting." Fisher, 165 Wn.2d at 746. Fisher did not hold that delayed reporting must be made an issue before ER 404(b) evidence is admissible to explain a delay. And, as the State points out, "such a rule would allow defense [counsel] to lie in wait and make an issue of the delay only in closing argument, when it is too late for the State to present evidence of the prior abuse to explain the delay." Moreover, we have recognized that the seemingly irrational or inconsistent conduct of a domestic violence victim implicitly raises the issue of the victim's credibility. See State v. Grant, 83 Wn. App. 98, 106-09, 920 P.2d 609 (1996). This is true regardless of whether the defense makes delayed reporting an issue. The court did not abuse its discretion in admitting Vela's prior acts to explain Veronica's delayed reporting and/or continuation of the relationship.[2]

Vela also contends his prior acts of domestic violence were inadmissible absent expert testimony explaining the dynamics of domestic violence to the jury. He contends such testimony is required because the dynamics of domestic violence are beyond the common knowledge of a lay person. Not only has no Washington court reached that conclusion, but Division Two of this court and a majority of the State Supreme Court have either expressly or implicitly rejected it. Cook, 131 Wn. App. at 852-53 ("While expert testimony may assist a jury in understanding the intricacies of relationships marked by violence, we do not

---

[2] Because we conclude Vela's prior acts were admissible on other grounds, we need not decide whether they were also admissible to prove the reasonable fear element of second degree assault.

believe such testimony is necessary in order to assess the state of mind of an individual whose acts are inconsistent with a report of abuse. The jury may draw from its own common knowledge and the evidence . . . to determine if the victim's inconsistent behavior is the result of a fear of retaliation, misguided affection, internalized shame or blame, or a continuing dependence on the defendant."); see Magers, 164 Wn.2d at 197-98 (dissent concluding that "[i]t is not self-evident why a victim involved in an abusive relationship may often change their testimony; expert testimony is necessary to establish why, in the context of the victim's relationship with the defendant, these inconsistencies may exist."). While dicta in Gunderson, 181 Wn.2d at 924-25 n.2, n.4, indicates that expert testimony would be helpful in some instances, it does not suggest the requirement proposed by Vela here. We decline to adopt such a requirement.

Finally, Vela contends his trial counsel was ineffective for failing to request a limiting instruction for the evidence admitted under ER 404(b). To establish ineffective assistance of counsel, a defendant must show both deficient performance and prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). We strongly presume that counsel provided effective assistance, and we will not find deficient performance if counsel's conduct can fairly be characterized as legitimate trial strategy or tactics. McFarland, 127 Wn.2d at 335-36; State v. Grier, 171 Wn.2d 17, 33, 246

No. 72627-7-I /12

P.3d 1260 (2011). Prejudice is established if there is a reasonable probability that, but for counsel's omissions, the result of the proceeding would have been different. State v. McFarland, 127 Wn.2d at 334-35.

Vela claims "there was no legitimate reason not to insist on the limiting instruction given the prejudicial nature of the uncharged domestic violence evidence." He concedes that foregoing a limiting instruction can be a tactical decision to avoid reemphasizing evidence, but contends such a tactic is reasonable only when the damaging evidence was briefly mentioned. Because the prior domestic violence evidence "formed a central piece of [Veronica's] testimony and the State's case," he contends a limiting instruction would not have raised "the specter of 'reminding' the jury of briefly referenced evidence." We are not persuaded.

Where counsel does not request a limiting instruction regarding prior bad acts, courts presume the omission was a tactical decision to avoid reemphasizing prejudicial information. State v. Yarbrough, 151 Wn. App. 66, 90, 210 P.3d 1029 (2009) (failure to propose a limiting instruction as to gang-related evidence presumed to be a legitimate trial tactic not to reemphasize damaging evidence); State v. Barragan, 102 Wn. App. 754, 762, 9 P.3d 942 (2000) (failure to propose limiting instruction for evidence of prior fights in prison dorms was a tactical decision not to reemphasize damaging evidence). Vela has not overcome this presumption.

12

Given the nature of the prior domestic violence evidence in this case, defense counsel could have reasonably concluded that drawing attention to that evidence would hurt more than help the defense. Unlike prior convictions or other indisputable proof of bad character, Vela's prior acts were disputable. In fact, the defense theory of the case was that Veronica had fabricated all the allegations, including the allegations of prior abuse. In these circumstances, counsel could have reasonably concluded that the value of a limiting instruction was outweighed by the concern that mentioning the prior acts in the court's verbal and written instructions would lend them undue credence. Because counsel's alleged omission can fairly be characterized as tactical, there was no deficient performance.

In addition, there is no reasonable probability that the absence of a limiting instruction affected the outcome of this case. Important aspects of Veronica's testimony were corroborated by her daughters' testimony and other evidence. Vela's testimony, on the other hand, at times verged on implausible and was severely undermined on cross-examination. Moreover, Vela's prior acts were not the focus of closing argument, and the prosecutor never urged the jury to consider those acts for propensity purposes. Vela's ineffective assistance claim fails.

Vela raises several additional claims in a statement of additional grounds for review. He contends the superior court violated double jeopardy principles when it proceeded with his case while charges involving the same incident were pending in Bothell Municipal Court. But, jeopardy does not attach in a bench trial

13

until the court hears evidence. State v. Pruitt, 145 Wn. App. 784, 795, 187 P.3d 326 (2008). Trial in the Bothell matter never commenced for double jeopardy purposes because the case was dismissed on the city's motion before the Bothell municipal court heard any evidence.

Vela also contends the court erred in allowing the jury to have "a piece of struck evidence"—i.e. his gun—during deliberations. He contends the gun "was struck as [an] element or evidence, because it was determined to not be operable" and "was taken out [of] jury instructions as an element of Assault 2." We note initially that this argument was apparently never raised below, and Vela offers no basis to review it for the first time on appeal. Accordingly, we need not consider it. RAP 2.5(a); State v. Grimes, 165 Wn. App. 172, 185-86, 267 P.3d 454 (2011). In any event, the argument is meritless.

Vela notes, correctly, that the prosecutor elected at the close of the evidence "not to proceed on the firearm . . . prongs of the assault in the second degree, just to keep this case . . . focused on the deadly weapon of the knife as the basis for the assault in the second degree." Vela is incorrect, however, when he says the gun was "struck evidence" and "had no business in [the] 'courtroom,' let alone in with [the] jury." The court did not strike the gun evidence. On the contrary, it was admitted as an exhibit and was relevant to Veronica's fear as well as Vela's credibility. As the prosecutor noted in closing argument:

> His explanations are inconsistent with both his own accounts and the evidence in this case. And that is the key in assessing the Defendant's credibility. He tries to explain the physical evidence in this case. . . .

14

. . .

   And trying to explain away the fact that the knives had been put away in the house by saying, well, that was his idea and it was his requirement for him to stay in this relationship, despite the fact he testified that he didn't want to be in the relationship, so that she wouldn't harm herself, this at the same time that he's testifying that he left a firearm . . . in the home that he had no idea whether it worked or not.

   And finally, the explanation for the gun being thrown out the window is, again, not only not credible, but what he's trying to -- what he's trying to convince you of demonstrates exactly what he's afraid that you -- the appropriate conclusions you'll draw.

   And that is when he took that gun and threw it out the window, there was only one reason he did it, and that's because he didn't want the police, who were knocking on the door, to find it. He didn't want the police to find that gun because he knew what he'd been doing with that gun, been threatening Veronica with it and intimidating and assaulting her with it.

   It wasn't out of some concern that Veronica might harm herself or harm him, because the reality is if what happened was, according to his testimony, was that he grabbed it to throw it out the window to keep it from her, once he's got it, there's no danger to him or her. He can take the gun and he can leave.

   When you look at the Vela's testimony in every one of these attempts to explain away the evidence that you heard, it becomes more and more unreasonable with every attempt to explain that away, and it reflects on his credibility. And what it tells you is that, unlike Veronica, who you can clearly rely upon as an accurate and reliable witness, Vela is not credible.

The court did not err in allowing the gun into the jury room with the other exhibits.

Vela also claims his offender score erroneously included the dismissed Bothell matter. Nothing in the record supports this claim. No criminal history is referenced in, or attached to, the judgment and sentence or other sentencing documents. Defense counsel told the sentencing court that Vela had no prior

felonies and his offender score was four "because of the way that the sentencing guidelines are structured to affect domestic violence cases." Counsel was referring to the fact that each of Vela's three current offenses had to be scored using the other two current offenses. RCW 9.94A.589(1)(a). By statute, the other current offenses, both of which were crimes of domestic violence, counted as two points each. RCW 9.94A.525 (21). This accounts for his offender score of 4.

Affirmed.

Leach, J.