FILED
COURT OF APPEALS
DIVISION II

2013 APR 30 AM 8:36

STATE OF WASHINGTON

BY_____
             DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 42027-9-II |
| Respondent, | (Consolidated with) |
| v. | |
| DESMOND RAY JOHNSON, | |
| Appellant, | |
| STATE OF WASHINGTON, | No. 42031-7-II |
| Respondent, | |
| v. | |
| KEVIN WAYNE FRANKLIN, | UNPUBLISHED OPINION |
| Appellant. | |

HUNT, J. — Desmond Ray Johnson and Kevin Wayne Franklin appeal their jury trial convictions for drive-by shooting, first degree unlawful possession of a firearm, and first degree assault; Franklin also appeals his gang-enhanced standard-range sentences. Both Johnson and Franklin argue that the trial court violated their right to a fair trial by erroneously admitting gang affiliation evidence to prove motive and intent under ER 404(b) and to prove the res gestae of the crimes. Johnson separately argues that the State's gang expert gave improper opinion testimony. Franklin separately argues that insufficient evidence supported his convictions and gang sentencing enhancements. We hold that the trial court did not abuse its discretion in admitting the challenged evidence, that sufficient evidence supports Franklin's convictions and sentencing

enhancements, and that Johnson failed to preserve his expert opinion testimony challenge. We affirm both defendants' convictions and Franklin's gang-enhanced sentences.

FACTS

I. DRIVE-BY SHOOTING, ASSAULT, AND UNLAWFUL POSSESSION CHARGES

Defendant Kevin Wayne Franklin was a member of the Eastside Gangster Crips in Bremerton; he considered fellow Tacoma Eastside Gangster Crips gang member Jerome Kennedy an "associate." 13 Verbatim Report of Proceedings (VRP) at 1624. The Tacoma Young Gangster Crips was a rival of Tacoma's Eastside Gangster Crips and Tacoma's Hilltop Crips.

In late May 2009, Hilltop Crips gang member Curtis Hudson was at a Tacoma 7-Eleven store with Kennedy (his brother) and his friend Kyle Ragland when a large fight broke out between these rival sets of the Crips gang. Hudson and John Morris of the Young Gangster Crips began pushing each other; Kennedy intervened and punched Morris. During the fight, Kennedy's gold necklace was stolen; eventually it came into Morris's possession.

The following week, Kennedy and Morris "had problems" with each other. 9 VRP at 929. Kennedy attempted to reclaim his gold necklace several times, but Morris made it clear that Kennedy would either have "to pay" or "to fight" Morris for it. 12 VRP at 1451.

About a week after the 7-Eleven fight, on the evening of May 30, Kennedy called Franklin "to go out"; Franklin agreed. 13 VRP at 1635. Kennedy and Conrad Evans, who was also known to "hang[ ] out" with the Eastside Gangster Crips, picked up Franklin in Evans' girlfriend's white Ford Explorer. 9 VRP at 925. Franklin sat in the driver's side backseat behind Evans; Kennedy was sitting in the front passenger seat. They picked up Desmond Johnson,

2

another of Franklin's "associate[s]" affiliated with the Eastside Gangster Crips, who sat in the back passenger seat next to Franklin. 13 VRP at 1623. Although both Franklin and Johnson were affiliated with the Eastside Gangster Crips, neither Franklin nor Johnson had been involved in the 7-Eleven fight.[1]

Evans, Kennedy, Franklin, and Johnson went to The Friendly Duck bar; they arrived around 12:45 AM and had a few drinks. While they were drinking, Kennedy received a phone call from Ragland, who was three blocks away at the 54th Street Bar and Grill with Hudson and Marcus Jenkins. According to Kennedy, Ragland's car was blocked in at the 54th Street Bar and Grill, and Ragland believed that someone in the car in front of him had taken a pistol from that car's trunk. Jenkins had seen Morris at the 54th Street Bar and Grill and knew that he was having "problems" with Hudson and Kennedy; Hudson also knew Morris was present. 9 VRP at 970. When Ragland and Kennedy hung up, Hudson understood that Kennedy would soon be at the 54th Street Bar and Grill.

Between 1:32 AM and 1:39 AM, Franklin texted his girlfriend that he was "handlin business." 11 VRP at 1320.[2] When she inquired what kind of "business" would keep him out at 2:00 AM, Franklin texted her: "Stop askin questions and use your head and you will know what I am on. *I jus got jacc't and now it's time to give some[one] the blues.*" 11 VRP at 1320 (emphasis added).

---

[1] The record reflects that only Kennedy had been involved in the 7-Eleven fight.

[2] We are quoting verbatim text messages sent through cellphones. We have not attempted to correct this quoted language.

Less than a minute later, The Friendly Duck's surveillance cameras caught Evans, Kennedy, Franklin, and Johnson getting back into the white Ford Explorer in the same configuration as before—i.e., with Evans driving, Kennedy in the front passenger seat, Franklin in the backseat on the driver's side, and Johnson in the backseat on the passenger's side. They drove to the 54th Street Bar and Grill and circled the parking lot a few times. Eventually, Hudson walked up to the Ford Explorer and appeared to speak with the occupants inside; the Ford Explorer then pulled around to the back alley.

At 2:03 AM, when people were leaving the 54th Street Bar and Grill, the white Ford Explorer (with Evans, Kennedy, Franklin, and Johnson inside) was parked in the back alley behind Ragland's car (with Ragland, Hudson, and Jenkins inside), which was behind Morris's green car, in the front of this line. As they were leaving, Kennedy phoned Hudson in Ragland's middle car to let Hudson know that he (Kennedy) was in the white Ford Explorer, behind Ragland's car. As they pulled out of the alley, Hudson received another call and was told to "turn off." 9 VRP at 965. At the next intersection, Morris's car turned left onto Cedar Street, Ragland's car turned right, and the Ford Explorer then turned left, following Morris's car onto Cedar Street. Guns from the passenger side of the Ford Explorer fired on Morris's car.[3] Apparently, no one in Morris's car was injured.[4]

---

[3] Kennedy later claimed that he had fired "two guns" (a .38 and .40 caliber) simultaneously from the Explorer's front passenger seat. The police suspected, however, that another occupant in the car had been the second shooter. 10 VRP at 1152.

[4] After fleeing the scene, Morris's car caught up with Ragland's car on Oakes Street and opened fire on it in a separate drive-by shooting; Ragland was killed, and Jenkins was shot in the back. Franklin and Johnson were not charged with any crime in connection with this second drive-by shooting. Nor do they challenge on appeal the trial court's admission of this evidence.

4

Three independent eye witnesses observed the drive-by shooting on Cedar Street. Shortly after 2:00 AM, Jeremy Berntzen had just exited a vehicle in his friend's Cedar Street driveway when he saw a white Ford Explorer with a "dark gray" "bottom" driving fast and shooting at a dark-colored car; he heard seven to nine gunshots, fired in rapid succession. 5 VRP at 205. Berntzen observed a person shooting from the Explorer's rear passenger-side window, but he could not identify any facial features.

Benjamin Grossman, who had been trailing Berntzen in his truck, was still seated in his vehicle when he saw a small sedan followed by a Ford Explorer turn quickly onto Cedar Street; he heard seven gunshots and saw "sparks" coming from the Explorer's rear passenger-side window. 6 VRP at 253. The Explorer and the other vehicle sped off in opposite directions. Three bullets struck Grossman's truck, hitting his passenger-side door and tire.

Darlene Esqueda heard gunshots while watching television in her home near Cedar Street. When she looked out her window, she saw a white SUV driving quickly, chasing a dark-colored car, with a person with a gun sticking his arm outside of the SUV's passenger-side window. Several other neighbors also heard gunshots and called the police. Within a minute, Officer Christopher Martin responded and confirmed that none of the bystanders were injured. Berntzen reported having seen "two" shooters on the Ford Explorer's passenger-side (one in front and one in back); and he provided a description of the vehicle, which Martin broadcast on the police radio. 6 VRP at 383.

Officer Nicholas Jensen was responding to the Cedar Street shooting within minutes of Martin's broadcast of the vehicle's description when he saw a white Ford Explorer speed past him, with "debris" (brush, grass, etc.) hanging from its undercarriage, and turn into a Chevron

5

gas station. 7 VRP at 495. Jensen pulled around the Chevron station, called for backup, and watched four men exit the Ford Explorer and approach a tannish-brown Cutlass parked at a gas pump.

After pulling into the Chevron station, Franklin immediately exited the Ford Explorer's rear driver-side seat, got into the Cutlass, and sat in its rear passenger-side seat; Kennedy exited the Explorer's front passenger seat, also got into the Cutlass, and sat in its front passenger seat. Evans exited the Explorer's driver's seat, spoke with the Cutlass's owner, and then entered the Chevron station. Inside the Chevron station, Evans called his girlfriend and told her to report the Explorer stolen. Johnson exited the Explorer on the rear passenger-side, threw a Burger King bag into the Chevron's garbage can, entered the Chevron station, and then appeared to place something on one of Chevron station's shelves. These actions were all recorded on the Chevron's surveillance video.

After backup arrived, police officers approached the Cutlass's owner and the four men from the Ford Explorer, handcuffed them, read them their *Miranda*[5] rights, placed them in patrol vehicles, and confiscated their cell phones. Franklin's and Johnson's cell phones contained photographs and/or monikers associated with the Tacoma Eastside Gangster Crips. Kennedy and Franklin had "neatly-folded" blue bandannas, emblems commonly associated with the Crips gang. 11 VRP at 1388.

During a protective sweep of the Ford Explorer and the Cutlass at the Chevron station, the officers discovered a .40 caliber handgun under the Cutlass's front passenger seat, where Kennedy had previously been seated; they found no weapons in the Ford Explorer. The officers

---

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

6

found four .38 caliber shell casings inside the Burger King bag that Johnson had thrown into the Chevron's garbage. On the Chevron station's shelves, they found a .38 caliber handgun, a holster, a black glove, and a black nylon bag with five unused .38 caliber bullets.

Police officers at the scene of the Cedar Street shooting found eight .40 caliber shell casings, which forensics testing later revealed had been fired from the same .40 caliber handgun discovered under the Cutlass's front passenger seat at the Chevron station. These officers also recovered two bullet fragments from Grossman's passenger-side seat and tire. And they found two fired .38 caliber bullets, which matched the shell casings from the discarded Burger King bag and had been fired from the same .38 caliber handgun found inside the Chevron station. The officers later took Berntzen to the Chevron station, where he identified the Ford Explorer as the one that had been involved in the drive-by shooting.

## II. PROCEDURE

The State charged Franklin and Johnson with drive-by shooting, first degree assault, second degree assault, and first degree unlawful possession of a firearm.[6] The State also sought sentencing enhancements (1) for the two assault charges, based on Franklin's and Johnson's having committed these crimes while armed with a firearm; and (2) for all counts, based on Franklin's and Johnson's having committed these crimes with intent to benefit a criminal street gang, in violation of RCW 9.94A.535(3)(aa).

---

[6] The State also charged Kennedy and Evans with these crimes. They pleaded guilty before trial.

A. Pretrial Motions

Franklin and Johnson moved in limine to prohibit the State from introducing ER 404(b) gang affiliation evidence and the 7-Eleven fight, in which neither had participated. The State argued that evidence of the earlier 7-Eleven fight and Franklin's and Johnson's gang affiliations were admissible under ER 404(b) as "res gestae" of the charged offenses and to show Franklin's and Johnson's motive and intent in committing the charged crimes. Clerk's Papers (CP) at 344. The trial court ruled that "limited testimony" about the 7-Eleven fight was admissible as "res gestae" of the charged offenses (because it was "part of the story"), conditioned on giving a limiting jury instruction that Franklin and Johnson had not been present during the 7-Eleven fight. 5 VRP at 163.

The trial court also ruled that (1) Franklin's, Johnson's, and the other participants' gang monikers were admissible to show their "identit[ies]" because they referred to each other by these nicknames and sometimes did not know each others' birth names; (2) their gang status and rivalries were admissible to show "motive"; and (3) Detective John Ringer could testify as a gang expert to explain gang culture and specific gang-related evidence (bandannas, tattoos, monikers, etc.) once the State established his qualifications. 5 VRP at 170. The trial court required a limiting instruction that Johnson did not have an identifiable gang moniker associated with him; and the trial court stated that it would give additional limiting instructions about Johnson's "knowledge or [gang] affiliation," depending on what the evidence showed at trial. 5 VRP at 181.

## B. Trial

### 1. State's evidence

The State's witnesses testified about the previously described facts. In addition, Evans testified that shots had been fired from only the front passenger seat but that he did not know who had been the shooter. Kennedy testified that he alone had shot at Morris's car by firing the .38 and .40 caliber handguns simultaneously from the Ford Explorer's front passenger seat, "[p]retty much because of [the 7-Eleven] altercation" that he had had with Morris a week earlier. 10 VRP at 1129. Kennedy admitted being associated with the Tacoma Eastside Gangster Crips, having gang tattoos and a blue bandana on him the night of the shooting, and placing the .40 caliber handgun under the seat of the Cutlass at the Chevron station.

Detective Ringer testified as an expert about gang culture, gang status and rivalries, and the gang evidence recovered in the case as follows: The Tacoma Eastside Gangster Crips (to which Kennedy belonged) and the Tacoma Young Gangster Crips (to which Morris belonged) are different "sets" of the Crips gang; Crips sets often "battle for supremacy," "respect," and "territory." 12 VRP at 1437, 1438. Because gangs like the Eastside Gangster Crips do not have a formal hierarchy, a gang member or associate can achieve status within the gang by having "connections" with drug dealers or by doing "drive-by shootings" and demonstrating his ability to keep rival gang members at bay. 12 VRP at 1465. Both a gang's and an individual gang member's "reputation" and "street credibility" are important; neither wants to be perceived as "weak." 12 VRP at 1483, 1484. If a gang member like Kennedy feels "disrespected" by a rival gang, "the very nature of the gang demands that [he] strike back" and "prove [his] worth." 12 VRP at 1487. If a fellow gang member or associate is asked to "step up" to help retaliate and he

9

does not assist, he will be considered "weak" and will eventually be "checked" by members of his own gang. 12 VRP at 1487, 1488. In Ringer's experience, it is not uncommon for gang members and associates to respond to a showing of disrespect with disproportionate levels of violence.

Ringer also discussed the physical evidence in the case. He testified that (1) the neatly-folded blue bandannas that police found on Kennedy and Franklin are commonly worn or displayed by Crips gang members as "flag[s]";[7] (2) gang members often use the term "associate" to refer to a person who "hang[s]" out with their gang but who is not yet a formal member; (3) gang members use monikers or nicknames to refer to each other; and (4) they usually also have several tattoos that display their gang affiliations. 12 VRP at 1483. Ringer further testified that he believed Franklin was a member of the Eastside Gangster Crips based on his blue bandanna and his several gang tattoos, including the acronym "EGC,"[8] which stands for "East Side Gangster Crip," tattooed across his back. 12 VRP at 1495. Ringer also testified Johnson's cell phone was "loaded with monikers," which showed that he also associated with the same gang. 12 VRP at 1496.

Ringer described his interviews with Franklin and Kennedy after the shooting. Although both men had initially been evasive, the next day Kennedy contacted police to provide additional information about the shooting and to minimize his involvement; Ringer explained that this contact had caused him concern because gang members generally do not want to speak with the police.

---

[7] 11 VRP at 1389.

[8] 13 VRP at 1626.

The State then elicited the following testimony about gang members' general unwillingness to cooperate with law enforcement:

> [STATE:] In regard to this intimidation factor . . . were you concerned about the veracity, I guess, of a gang person, Mr. Kennedy, giving you truthful information?
> [RINGER:] Definitely.
> [STATE:] Is there in your experience an adverse effect to when a gang member talks, whether they're being truthful or not, to law enforcement?
> [RINGER:] *Almost 100 percent of the time, a . . . gang member, is not going to be totally honest with law enforcement* in an interview. . . . The whole culture of the gangs says you don't cooperate with the police. You certainly don't talk honestly with the police. You don't snitch. You don't tell on fellow gang members even if you're a victim. You tend—the gang culture says you don't talk with the police, you don't cooperate.
> [W]hen we find a gang member who's willing to talk, we approach it very sort of apprehensively as far as whether he's going to tell the truth or not. We take everything with a grain of salt. We work through the issues and try to get as much of the truth as possible, but we go in anticipating that they're not going to be truthful with us.

12 VRP at 1406-07 (emphasis added). Neither Franklin nor Johnson objected to this testimony or moved to strike Ringer's statements.

## 2. Defendants' evidence

Franklin testified in his own defense; Johnson did not. Franklin admitted (1) having served 24 months in prison for robbery;[9] (2) being "jumped into" the Eastside Gangster Crips; (3) having the gang moniker "Monster"; (4) having several gang tattoos; (5) having a blue bandanna on him the night of the shooting and that such bandannas are a "flag" of the Eastside Gangster Crips; and (6) sending his girlfriend a text message shortly before the shooting, which message stated that he had been "jacked" and that he was going to give somebody the "blues." 13 VRP at 1623, 1624, 1641. But he denied that his text message had anything to do with the

---

[9] Franklin testified that his prior conviction was merely for "[r]obbery," but his judgment and sentence show that it was for first degree robbery. 13 VRP at 1620.

shooting of Morris's car or the previous fight at the 7-Eleven, both of which he claimed he knew nothing about.[10]

Franklin similarly denied seeing any guns the night of the shooting. He claimed that he had been drinking heavily that night,[11] he had "passed out" in the Ford Explorer's backseat after arriving at the 54th Street Bar and Grill, and the next thing he remembered was waking up to the sound of "gunshots" and being "tossed around" in the Ford Explorer as it drove through a ditch. 13 VRP at 1644, 1645. In a written declaration, Kennedy corroborated this part of Franklin's testimony, stating that Franklin had been asleep at the time of the shooting.

### C. Judgment and Sentence

The jury found both Johnson and Franklin guilty of drive-by shooting, first degree unlawful possession of a firearm, and first degree assault. The jury also returned special verdicts on Franklin's counts,[12] finding that he had committed all three crimes with intent to benefit a criminal street gang and that he had committed first degree assault while armed with a firearm.[13] The trial court imposed standard range sentences for Franklin's underlying convictions plus an additional 60 months for his firearm sentencing enhancement on the first degree assault charge,

---

[10] According to Franklin, his car had been broken into the night before the shooting, and items had been stolen from him. He asserted that his text messages about being "jacked" related to this earlier incident. 13 VRP at 1641.

[11] In contrast, Ringer testified there was no evidence of Franklin's having been intoxicated during their interview immediately after the May 31 incident.

[12] The jury did not reach a verdict about whether Johnson had committed first degree assault while armed with a firearm or whether he had committed the crimes for which he was convicted with the intent to benefit a criminal street gang.

[13] Franklin does not challenge this firearm sentencing enhancement on appeal.

resulting in a total of 200 months confinement; it does not appear that the trial court imposed additional time for Franklin's gang sentencing enhancements.[14] The trial court imposed low-end standard range sentences for Johnson's convictions, resulting in 138 months total confinement. Franklin and Johnson appeal their convictions; Franklin also appeals his gang-enhanced sentences.

## ANALYSIS

### I. EVIDENCE ADMISSIBILITY

Franklin and Johnson first argue that we should reverse their convictions because the trial court erroneously admitted the following prejudicial evidence as exceptions under ER 404(b): (1) the 7-Eleven fight, as "res gestae" of the charged crimes; and (2) gang affiliation, to establish their motive and intent for participating in the drive-by shooting. Br. of Appellant (Franklin) at 37; Br. of Appellant (Johnson) at 16. These arguments fail.

We review a trial court's evidentiary rulings for abuse of discretion. *State v. Lormor*, 172 Wn.2d 85, 94, 257 P.3d 624 (2011); *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009). A trial court abuses its discretion if its decision is manifestly unreasonably or exercised on untenable grounds or for untenable reasons. *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). Such an abuse of discretion exists if the trial court relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its

---

[14] The State asked the trial court to impose high-end standard-range sentences for Franklin rather than additional time for his gang aggravators. The trial court appears to have partially adopted the State's recommendation by imposing (1) high-end standard range sentences of 54 months for Franklin's drive-by shooting and unlawful possession of a firearm convictions; and (2) a low-end standard range sentence of 140 months for Franklin's first degree assault conviction, plus an additional 60 months for the firearm sentencing enhancement.

ruling on an erroneous view of the law. *Lord*, 161 Wn.2d at 284. We find no abuse of discretion here.

### A. 7-Eleven Fight: ER 401, 402, and 403

Franklin and Johnson argue that the trial court's admission of the 7-Eleven fight was reversible error because (1) neither of them had participated in that fight, which, thus, did not constitute a prior "bad act" by *them* under ER 404(b); and (2) even if the 7-Eleven fight were a prior bad act for ER 404(b) purposes, it was not admissible as "res gestae" because the fight occurred a week before the drive-by shooting and, thus, was not part of the shooting's "'immediate time and place.'" Br. of Appellant (Franklin) at 38, 50-51 (quoting *State v. Hughes*, 118 Wn. App. 713, 725, 77 P.3d 681 (2003)); Br. of Appellant (Johnson) at 16. That neither Franklin nor Johnson participated in the 7-Eleven fight between Kennedy and Morris is not dispositive; nor does the typical ER 404(b) "prior bad acts" analysis resolve the question before us.

Despite the parties' ER 404(b)-based arguments, we follow our recent "res gestae" evidentiary analysis in *State v. Grier*, 168 Wn. App. 635, 644, 278 P.3d 225 (2012), and hold that the trial court did not abuse its discretion in admitting evidence of the 7-Eleven fight. As we also noted in *Grier*, Washington courts have traditionally stated that evidence of other crimes, wrongs, or acts is admissible under ER 404(b)'s "'res gestae'" or "'"same transaction' exception'"" if the evidence is "admitt[ed] to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime." *Grier*, 168 Wn. App. at 645 (quoting *State v. Hughes*, 118 Wn. App. 713, 725, 77 P.3d 681 (2003) (quoting *State v. Brown*, 132 Wn.2d 529, 570-71, 940 P.2d 546 (1997)); *State v. Lillard*, 122 Wn. App. 422,

432, 93 P.3d 969 (2004), *review denied*, 154 Wn.2d 1002 (2005). Although cases applying this rationale have purported to analyze "res gestae" evidence as an ER 404(b) "exception," we departed from this practice in *Grier*; instead, we analyzed such "res gestae" evidence under ER 401, 402, and 403, focusing on its relevance to the particular case before us and on whether the danger of unfair prejudice outweighed its probative value. *Grier*, 168 Wn. App. at 644. We recognized that, rather than being an ER 404(b) exception, "'res gestae' evidence more appropriately falls within ER 401's definition of 'relevant' evidence, which is generally admissible under ER 402," as long as the evidence also passes ER 403's prejudice versus probative value test. *Grier*, 168 Wn. App. at 646.

Following *Grier*,[15] we apply ER 401 and ER 402's relevancy tests and ER 403's prejudice test to determine whether the trial court here abused its discretion in admitting evidence of the 7-Eleven fight.[16] "The threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). Under ER 401, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "Evidence is relevant if a logical nexus exists

---

[15] In *Grier*, we recognized that although ER 404(b) provides a non-exhaustive list of "'other purposes'" for which trial courts may admit evidence of other crimes, wrongs, or acts, the judicially-created "'res gestae'" exception is unlike the exceptions expressly listed in ER 404(b) because it involves evidence pertaining to the *factual* context of the crime, not the defendant's mindset. *Grier*, 168 Wn. App. at 645-46 (quoting ER 404(b)). Thus, considering "res gestae" evidence under ER 404(b) contravenes the ejusdem generis doctrine of statutory construction; and, as we noted in *Grier*, analysis of such evidence is more appropriate under ER 401, 402, and 403. *Grier*, 168 Wn. App. at 646.

[16] Accordingly, we do not reach Franklin's and Johnson's first argument that the 7-Eleven fight did not constitute a "prior act" admissible under ER 404(b).

between the evidence and the fact to be established." *State v. Burkins*, 94 Wn. App. 677, 692, 973 P.2d 15 (1999). Nevertheless, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403.

Applying these evidentiary rules here, we conclude that the 7-Eleven fight evidence was relevant under ER 401 and had a logical nexus with the charged crimes because (1) it had precipitated the shooting of Morris's car a week later, at least in part; and (2) it tended to prove that Kennedy, and potentially the other Ford Explorer occupants, had a motive for shooting at Morris's car and that they had acted in concert (as either principals or accomplices) to carry out the charged crimes. Kennedy, one of the admitted principals in these crimes, had previously fought with Morris at the 7-Eleven, during which Kennedy's gold chain had been stolen and had later ended up in Morris's possession. During the week between the 7-Eleven fight and the drive-by shooting, Kennedy had been "having problems"[17] with Morris; Kennedy had attempted to reclaim his gold necklace several times, but Morris had made it clear that Kennedy would either have "to pay" or "to fight" Morris for it. 12 VRP at 1451.

The record contains no evidence placing Franklin and Johnson with Kennedy during his earlier 7-Eleven fight with Morris. Nevertheless, it was undisputed that a week later, when Kennedy went to resolve the missing gold chain issue with Morris, (1) Kennedy had asked Franklin "to go out"[18] with him; and (2) both Franklin and Johnson were with Kennedy in the Ford Explorer before, during, and after the drive-by shooting of Morris. Thus, the 7-Eleven fight

---

[17] 9 VRP at 929.

[18] 13 VRP at 1635.

was intertwined with and "'complete[d] the story of the crime[s] on trial by proving [their] immediate context of happenings near in time and place'"; and it "'depicted'" a "'complete picture . . . for the jury.'" *Grier*, 168 Wn. App. at 647 (first alteration in original) (internal quotation marks omitted) (quoting *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995), and *State v. Acosta*, 123 Wn. App. 424, 442, 98 P.3d 503 (2004), respectively).

Moreover, the danger of unfair prejudice did not outweigh this 7-Eleven fight's probative value under ER 403. Misconduct is often admissible when it is probative and material, such as when it completes the description of the crime charged and is so connected in time, place, and circumstance. *State v. Tharp*, 96 Wn.2d 591, 594-96, 637 P.2d 961 (1981). At trial, the State argued that Johnson and/or Franklin were potential accomplices to the crimes that Kennedy, the principal, had undisputedly perpetrated and which were in evidence. Kennedy testified that, on the night of the shooting, he intended to confront Morris because only one week before, at the 7-Eleven down the street, Morris had taken a chain necklace that belonged to Kennedy. Such quarrels between a victim and the person who instigated harming the victim are probative of the harming person's intent. *See State v Parr*, 93 Wn.2d 95, 102, 606 P.2d 263 (1980).

To prove that Franklin and/or Johnson were accomplices to Kennedy's crimes, the State needed to show that these defendants knowingly "promote[d]" or "facilitate[d]" the commission of the crimes (1) by soliciting, commanding, encouraging, or requesting another person to commit the crimes; or (2) by aiding or agreeing to aid another in the planning or committing of the crimes. RCW 9A.08.020(3)(a).[19] The State presented evidence that Franklin and Johnson

---

[19] The legislature amended RCW 9A.08.020 in 2011. LAWS OF 2011, ch. 336, § 351. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

17

knowingly promoted or facilitated Kennedy's criminal objective: On the night of the shooting, less than a minute before the four men left for the bar where Morris was known to be present, Franklin sent text messages to his girlfriend "Lady Monster" that he had "just got jacc't" and was "[h]andlin' business." 11 VRP at 1320. The car carrying Kennedy, Franklin, and Johnson circled the establishment a few times, parked in a back alley, and then waited and followed the car that Morris was in. Kennedy testified that things "escalated" and shots were fired at Morris's car from the Explorer in which Johnson and Franklin were passengers with him (Kennedy). 10 VRP at 1141. Johnson's and Franklin's accomplice liability for the drive-by shooting and assault charges stems from these events.

The fight at the 7-Eleven, where Morris "jacc't" Kennedy's chain, was close in time and place to the shooting and, thus, was integrally connected. 11 VRP at 1320. The 7-Eleven fight was also an inseparable part of the charged crimes, without which the jury would have been left with a fragmented story and no context for Franklin's and Johnson's accomplice liability. Furthermore, the probative value of the 7-Eleven fight outweighed any prejudice to the defendants because the trial testimony neither directly stated nor indirectly implied that Johnson and Franklin had been present at this fight between Kennedy and Morris. We hold, therefore, that the trial court did not abuse its discretion in admitting evidence of the 7-Eleven fight.

### B. Gang Evidence: ER 404(b)

Franklin and Johnson also argue that the trial court erroneously used ER 404(b) to admit other prejudicial evidence about their "gang associations" and "gang culture," namely their gang status and rivalries and Ringer's expert testimony on gang culture, thus denying them a fair trial. Br. of Appellant at 36 (Franklin); Br. of Appellant (Johnson) at 16. The State counters that this

18

gang evidence was admissible under ER 404(b) to show the defendants' collective motive and intent in committing the crimes charged. We agree with the State that the gang evidence was admissible to show motive.

"ER 404(b) is not designed 'to deprive the State of relevant evidence necessary to establish an essential element of its case,' but rather to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged." *State v. Foxhaven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007) (quoting *State v. Lough*, 125 Wn.2d 847, 859, 889 P.2d 487 (1995)). As Franklin and Johnson correctly note, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person or conformity with it; but it may be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or the absence of mistake or accident. ER 404(b). Before a trial court may admit such evidence of other crimes or misconduct under ER 404(b), it must (1) find by a preponderance of the evidence that the misconduct occurred, (2) state on the record the purpose for which the evidence is being introduced, (3) determine whether the evidence is relevant to a material issue, and (4) balance the probative value of the evidence against the danger of unfair prejudice. *State v. Mee*, 168 Wn. App. 144, 154, 275 P.3d 1192, *review denied*, 175 Wn.2d 1011 (2012).

Gang evidence falls within the scope of ER 404(b). *Yarbrough*, 151 Wn. App. at 81. Courts have "regularly admitted gang affiliation evidence to establish the motive for a crime," to prove a defendant's intent, or to show that several defendants were acting in concert. *State v. Scott*, 151 Wn. App. 520, 527, 213 P.3d 71 (2009), *review denied*, 168 Wn.2d 1004 (2010); *Yarbrough*, 151 Wn. App. at 81; *see also State v. Embry*, 171 Wn. App. 714, 732, 287 P.3d 648

19

(2012) (evidence of concerted action is basis for finding multiple individuals guilty for taking part in a single crime). But before a trial court may admit gang affiliation evidence, there must be a "nexus" between the charged crime and gang affiliation; this nexus makes the gang evidence relevant. *Embry*, 171 Wn. App. at 732 (citing *Scott*, 151 Wn. App. at 526). Such is the case here.

### 1. Nexus

In its offer of proof, the State asserted that it would present evidence that (1) Franklin, Johnson, and the other participants in the shooting were "gang members"[20] affiliated with the Eastside Gangster Crips; (2) a week before the shooting, Kennedy had been in a fight with rival gang member Morris, which resulted in Kennedy's gold necklace being stolen and its ending up in Morris's possession; (3) Morris's stealing Kennedy's chain was a showing of "disrespect"[21] in the gang community, which often prompted a "disproportionate response"[22] from the offended gang; (4) Kennedy's being disrespected by rival gang member Morris was the "triggering event" that motivated Kennedy, Evans, Franklin, and Johnson to retaliate with the drive-by shooting of Morris's car; and (5) circumstances surrounding the drive-by shooting suggested that the four men had "work[ed] together" to accomplish the crimes, such as Kennedy's phone calls with Hudson and Ragland at the 54th Street Bar and Grill and Franklin's texts to his girlfriend about being "jacc't" and giving someone "the blues." 5 VRP at 156, 161; 11 VRP at 1320.

---

[20] 1 VRP at 67.

[21] 1 VRP at 69.

[22] 5VRP at 177.

We have previously held that there was a sufficient nexus between gang affiliation and the defendants' alleged crimes where the State presented evidence that (1) the defendants' killings were a result of rival gang activity; (2) the victims had shown disrespect for the defendants and had intruded on their "drug . . . turf"; and (3) in gang culture, this disrespect and intrusion were grounds for retaliation and murder. *State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050, *review denied*, 128 Wn.2d 1004 (1995). Similarly here, the State asserted it would present evidence that the drive-by shooting was the result of rival gang member Morris's showing disrespect to Kennedy and to the Eastside Gangster Crips when he stole Kennedy's gold necklace and that, in gang culture, such disrespect was grounds for disproportionate retaliation.

At trial, gang-expert Ringer also testified that a gang member or associate can achieve status by doing "drive-by shootings" on a rival gang; and if such member or associate does not "step up" and help retaliate when asked, he will be perceived as "weak" and will be "checked" by members of his own gang. 12 VRP at 1464, 1487, 1488. This testimony connected Franklin's and Johnson's gang affiliations, as well as Kennedy's, to the charged crimes. We hold, therefore, that there was a sufficient nexus between Franklin's and Johnson's gang affiliations and the charged crimes.

### 2. ER 404(b) requirements

Under ER 404(b), the trial court must first find by a preponderance of the evidence that the misconduct occurred. *Embry*, 171 Wn. App. at 732. The State's offer of proof was that, in addition to using monikers associated with gang membership, (1) Franklin had the Eastside Gangster Crips acronym "EGC" tattooed in large letters on his back, (2) Kennedy had identified Johnson as an Eastside Gangster Crip, and (3) the police had found monikers and other

information in Johnson's cell phone linking him to that gang. 5 VRP at 171. Consistent with this offer of proof, Franklin testified that he had the acronym "EGC" tattooed on his back and that it stood for "East Side Gangster Crip." 13 VRP at 1626. Based on this evidence, the trial court properly found by a preponderance of the evidence that Franklin and Johnson were either gang members or gang associates and that the relevant misconduct had occurred.

Second, the trial court had to identify the purpose for which the gang evidence would be introduced. *Embry*, 171 Wn. App. at 732. Here, the trial court concluded that the evidence was admissible to show the defendants' collective motive for the charged crimes. Washington courts have held that defendants' gang affiliations were admissible under ER 404(b) to prove motive because it (1) was highly probative of the State's theory—that the defendants were gang members "who responded with violence" to showings of disrespect, and (2) "established that killing someone heightened a gang member's status." *Campbell*, 78 Wn. App. at 822; *State v. Boot*, 89 Wn. App. 780, 789, 950 P.2d 964, *review denied*, 135 Wn.2d 1015 (1998). Here, the gang evidence was similarly admissible to show the motives of (1) Kennedy, who had personally been "disrespected" when Morris stole his gold chain; and (2) Franklin and Johnson, who were likely willing participants, motivated by a desire to increase their gang status and to avoid being perceived as weak. The trial court did not abuse its discretion in determining that motive was an admissible purpose for the gang evidence.

Third, the trial court had to determine that the evidence was relevant to a material issue. *Mee*, 168 Wn. App. at 154. Here, in addition to showing Franklin's and Johnson's motives, the gang evidence was relevant to a material issue because it tended to prove the intent element of Franklin's and Johnson's crimes and to prove Franklin's gang-aggravated sentencing

22

enhancement factors. Because the evidence showed that Kennedy and potentially only one other occupant in the four-occupant Ford Explorer had fired the guns at Morris's car, the trial court instructed the jury on accomplice liability. To prove that Franklin and Johnson were accomplices to the drive-by shooting of Morris's car and to the resulting assault on Grossman, the State needed to prove that Franklin and Johnson had "the criminal mens rea to aid or agree to aid the commission of a specific crime" and acted "with knowledge [that] the aid [would] further the crime." *State v. Coleman*, 155 Wn. App. 951, 960-61, 231 P.3d 212 (2010), *review denied*, 170 Wn.2d 1016 (2011). The aggravating sentencing factors accompanying each charged offense also required the State to prove that Franklin and Johnson "committed the offense with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as defined in RCW 9.94A.030, its reputation, influence, or membership." RCW 9.94A.535(3)(aa).

Evidence of Franklin's and Johnson's gang affiliations, and Ringer's testimony about the role of "disrespect"[23] in gang culture and the ways that a gang member can achieve "status" within a gang (e.g., by doing drive-by shootings), helped establish their accomplice liability and the aggravating sentencing factors on all counts. This evidence tended to show that Franklin and Johnson had knowingly participated in the crimes—if not by shooting the second gun themselves, then by encouraging or aiding in the commission of the shooting by another. We hold that the trial court did not abuse its discretion in concluding that the gang evidence was relevant to a material issue in the case.

---

[23] 12 VRP at 1487.

Fourth, the trial court had to weigh the probative value of the gang affiliation evidence against its potential prejudicial effect. *Embry*, 171 Wn. App. at 732. As we have already noted in the preceding section of this analysis, the gang evidence was highly probative of the State's theory that Kennedy, Evans, Franklin, and Johnson had acted in concert and had shot at Morris's car in retaliation for his showing "disrespect" toward Kennedy and the Eastside Gangster Crips by stealing Kennedy's gold chain. The trial court properly balanced the gang evidence's probative value against the danger of unfair prejudice to Franklin and Johnson.

The State demonstrated a sufficient connection between Franklin's and Johnson's gang affiliations and the crimes charged. Accordingly, we hold that the challenged gang evidence satisfied the requirements of ER 404(b) and that the trial court did not abuse its discretion in admitting the gang affiliation evidence.

## II. EVIDENCE SUFFICIENCY

Franklin separately argues that, absent an improper inference that he had a propensity to commit violent crimes because he was a gang member, the State presented insufficient evidence to support his convictions for any of the charged crimes or for the gang-aggravating sentencing-enhancement factors. These arguments fail.

When reviewing a challenge to the sufficiency of the evidence, we ask whether, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Hosier*, 157 Wn.2d 1, 8, 133 P.3d 936 (2006). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (en banc). Circumstantial evidence and direct evidence

are equally reliable. *State v. Moles*, 130 Wn. App. 461, 465, 123 P.3d 132 (2005). A reviewing court must also defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)).

### A. Drive-by Shooting and First Degree Assault: Accomplice

Franklin first argues that the State presented insufficient evidence to support his drive-by shooting and first degree assault convictions because there was no evidence that, although he was in the Ford Explorer, he had knowledge that he was promoting or facilitating the commission of these crimes. We disagree.

At the outset we note that Franklin does not challenge the sufficiency of the evidence that someone else (e.g., Kennedy and/or Johnson) committed the charged crimes. Instead, he argues that the State failed to produce evidence of his "knowledge" that he was promoting or facilitating other persons' commission of these crimes, sufficient to support his accomplice liability. Br. of Appellant (Franklin) at 40. Thus, we focus our analysis on the sufficiency of the evidence to support Franklin's culpability as an accomplice.

A defendant is an "accomplice" if, with knowledge that it will promote or facilitate the crime, he either (1) solicits, commands, encourages, or requests another person to commit the crime; or (2) aids or agrees to aid another person in planning or committing the crime. RCW 9A.08.020(3)(a). To be an accomplice, the defendant must act with knowledge that he is promoting or facilitating *the* specific crime charged, not simply "a crime." *State v. Cronin*, 142 Wn.2d 568, 578-79, 14 P.3d 752 (2000). To be culpable as an accomplice, however, the defendant need not participate in the crime, have specific knowledge of every element of the

crime, or share the same mental state as the principal. *State v. Berube*, 150 Wn.2d 498, 511, 79 P.3d 1144 (2003). Thus, even if the jury did not believe that Franklin fired the shots from the Ford Explorer, the jury could still find him guilty of drive-by shooting and first degree assault if the State proved he was an accomplice of the person who did fire the shots. RCW 9A.08.020.

A person commits drive-by shooting

> when he . . . *recklessly* discharges a firearm . . . in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge is . . . from a motor vehicle.

RCW 9A.36.045(1) (emphasis added). A jury may infer reckless conduct where a person unlawfully discharges a firearm from a moving vehicle. RCW 9A.36.045(2).

A person commits first degree assault if he, with intent to commit great bodily harm, "[a]ssaults another with a firearm . . . or by any force or means likely to produce great bodily harm or death." RCW 9A.36.011(1)(a). RCW 9A.04.110(4)(c) defines "[g]reat bodily harm" as "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ."

Franklin contends the State presented insufficient evidence to support the knowledge element of his accomplice liability because (1) the State's evidence showed only that he was a gang member and that gang members retaliate against rival gangs' showing disrespect; and (2) there was no evidence that he was in the Ford Explorer with the "intent to aid in the shooting" rather than being merely "someone present when the shooting occurred." Br. of Appellant (Franklin) at 58. According to Franklin, Washington law does not allow the jury to infer that he knew he was aiding in the crimes based on the circumstances surrounding the shooting. Franklin

mistakenly relies on *State v. Bluehorse*, in which we held that generalized expert testimony about "gang culture" *alone* was insufficient to support the gang-aggravating sentencing factor for Bluehorse's exceptional sentence because the evidence failed to show that he had committed the drive-by shooting "for reasons related to obtaining or maintaining gang membership or advancing [status] in the gang." *State v. Bluehorse*, 159 Wn. App. 410, 429, 431, 248 P.3d 537 (2011).

But unlike the gang aggravating sentencing factor in *Bluehorse* and the street gang aggravating sentencing factors discussed below, here, the State did not need to present evidence that Franklin had aided in committing the drive-by shooting and assault for gang membership purposes in order to prove his accomplice liability for these underlying crimes. Instead, the State needed to prove only the elements of accomplice liability—i.e., that Franklin had solicited, commanded, encouraged, requested, aided, or agreed to aid in the commission of the crimes with "general knowledge" that his actions were "promoting or facilitating" these crimes. *Cronin*, 142 Wn.2d at 579. We hold that the State met its burden here.

We acknowledge that Franklin's mere physical presence and assent alone were insufficient to constitute aiding and abetting. Nevertheless, "[p]resence at the scene of an ongoing crime may be sufficient if a person is 'ready to assist.'" *In re Welfare of Wilson*, 91 Wn.2d 487, 491, 588 P.2d 1161 (1979) (quoting *State v. Aiken*, 72 Wn.2d 306, 349, 434 P.2d 10 (1967), *vacated on other grounds by Wheat v. Washington*, 392 U.S. 652, 88 S. Ct. 2302, 20 L. Ed. 2d 1387 (1968)). A person is "'ready to assist'" if he, in some way, associates himself with the undertaking, participates in it as something he desires to bring about, or by his actions seeks to make it succeed. *Wilson*, 91 Wn.2d at 491 (quoting *Aiken*, 72 Wn.2d at 349).

Here, in addition to the challenged gang evidence, the State presented strong circumstantial evidence that Franklin was a knowing and willing participant in the drive-by shooting and resulting assault on bystander Grossman seated in his (Grossman's) truck: Franklin was at The Friendly Duck bar with Kennedy when Ragland called Kennedy, asking him to come to the 54th Street Bar and Grill, where rival Morris was present. Franklin then texted his girlfriend that he had just gotten "jacc't," and he was going to "give some[one] the blues." 11 VRP at 1320. Less than a minute later, Franklin got into the Ford Explorer and rode off with Kennedy, Evans, and Johnson to the 54th Street Bar and Grill, where the Ford Explorer eventually got directly behind Morris's car and someone in the Explorer shot at it. Mere minutes after the shooting, Franklin exited the Explorer at the Chevron station while Kennedy and Johnson disposed of the two weapons used in the shooting. Based on this evidence—particularly Franklin's contemporaneous text messages to his girlfriend that he had just gotten "jacc't" and he was going to "give some[one] the blues"—a rational jury could conclude that he was "ready to assist" in the shooting of Morris's car and that he was present in the Ford Explorer with knowledge that his actions were promoting or facilitating the commission of the crimes. 11 VRP at 1320. Looking at the evidence post conviction in the light most favorable to the State, as we must, we hold that the State presented sufficient evidence that Franklin was an accomplice to the drive-by shooting and the resulting assault on Grossman.

## B. Unlawful Possession of a Firearm

Franklin next argues that the State presented insufficient evidence to support his unlawful possession of a firearm conviction because the State did not prove that he possessed a firearm. The State responds the jury can infer that Franklin and Johnson had joint possession of the

28

firearm fired from the backseat because (1) they both "shared [the gang's] intent and purpose" to use this gun to shoot at Morris's car, and (2) both had ready access to the gun depending on which side of the Explorer eventually provided the best shot at Morris's car. Br. of Resp't at 21.

A person is guilty of first degree unlawful possession of a firearm "if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted . . . of any serious offense as defined in this chapter." RCW 9.41.040(1)(a).[24] A "[s]erious offense" includes a felony for "[a]ny crime of violence," such as first degree robbery. RCW 9.41.010(16)(a);[25] *State v. Rivera*, 95 Wn. App. 132, 137, 974 P.2d 882, 992 P.2d 1033 (2000). Franklin testified that he had been previously convicted of such a "serious offense"; thus, the State did not need to offer additional proof that he could not lawfully possess a firearm. RCW 9.41.010(16)(a); *Rivera*, 95 Wn. App. at 137. To prove possession, the State had to show that Franklin either actually or constructively possessed a firearm. *State v. Roberts*, 80 Wn. App. 342, 353, 908 P.2d 892 (1996). Actual possession requires physical custody. *State v. Cantabrana*, 83 Wn. App. 204, 206, 921 P.2d 572 (1996). Although the jury returned a special verdict that Franklin committed his crimes while armed with a firearm, the record

---

[24] The legislature amended RCW 9.41.040 in 2011. LAWS OF 2011, ch. 193, § 1. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

[25] The legislature amended RCW 9.41.010 in 2009. LAWS OF 2009, ch. 216, § 1. The amendments did not alter the statute in any way relevant to this case; accordingly, we cite the current version of the statute.

contains no admissible evidence that Franklin actually possessed a firearm.[26] Constructive possession, however, (1) may be established by showing that the defendant had "dominion and control over the firearm or over the premises where the firearm was found,"[27] (2) need not be exclusive, and (3) may include joint possession with another person. *State v. Morgan*, 78 Wn. App. 208, 212, 896 P.2d 731, *review denied*, 127 Wn.2d 1026 (1995) (citing *State v. Harris*, 14 Wn. App. 414, 417, 542 P.2d 122 (1975), *review denied*, 86 Wn.2d 1010 (1976)). Although a defendant's close proximity to an object alone is insufficient to establish constructive possession,[28] other facts may enable a trier of fact to infer dominion and control, such as the defendant's "ability to reduce an object to actual possession." *State v. Echeverria*, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997).

In determining whether a defendant exercised the requisite dominion and control over an object, we consider the "totality of the circumstances"; no single factor is dispositive. *State v. Collins*, 76 Wn. App. 496, 501, 886 P.2d 243, *review denied*, 126 Wn.2d 1016 (1995). The State presented evidence that *two* guns were used to shoot at Morris's car from the Ford Explorer. Although Kennedy testified that he had fired both guns from the front passenger seat, at least two

---

[26] The trial court admitted Ringer's hearsay testimony—that Kennedy had told him Franklin and Johnson had each brought a gun with them the night of the shooting and that Franklin had handed one of the guns to Kennedy to shoot while Johnson had shot the other one from the back passenger seat—only for impeachment purposes; and the trial court so instructed the jury. Thus, Ringer's hearsay testimony did not provide substantive evidence that Franklin actually possessed a firearm.

[27] *State v. Echeverria*, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997).

[28] *State v. Turner*, 103 Wn. App. 515, 521, 13 P.3d 234 (2000).

eye witnesses reported having seen shots being fired from the back passenger seat, where Johnson had been seated, next to Franklin, seated behind the driver.

As we have explained in sections I and II.B. of this Analysis, the State presented admissible evidence that (1) gang members commit crimes to avenge disrespect and to increase their status within the gang; (2) Franklin was a member of Kennedy's gang, with which Evans and Johnson were also affiliated; (3) Franklin was a knowing and willing participant in the drive-by shooting of rival gang member Morris's car, as evinced by his (Franklin's) response to Kennedy's invitation to "go out"[29] with him, his (Franklin's) text to his girlfriend that he was going to "give some[one] the blues,"[30] and his (Franklin's) riding with Kennedy, Evans, and Johnson in the Ford Explorer to the 54th Street Bar and Grill, where the Ford Explorer eventually got directly behind Morris's car and shot at it; (4) one of the two guns used in the shooting appeared to have been fired from the backseat, where Franklin and Johnson were both seated, with no known barriers between them to prevent their handing the gun to whichever of them was ultimately positioned on the side of the Explorer closer to Morris's car and, thus, better able to shoot at it; and (5) right after the shooting, Franklin exited the Explorer at the Chevron station while Kennedy and Johnson disposed of the two weapons used in the shooting. From this evidence, a reasonable jury could infer joint cooperation among these specific gang members in their mission to avenge Morris's disrespect of and theft from Kennedy. Viewing the evidence in the light most favorable to the State, we hold that a rational jury could conclude that Franklin had constructive possession of a firearm because he had the ability "to reduce" the firearm in the

---

[29] 13 VRP at 1635.

[30] 11 VRP at 1320.

31

Explorer's back seat to his "actual possession." *Echeverria*, 85 Wn. App. at 783. We further hold, therefore, that the State presented sufficient evidence to support Franklin's first degree unlawful possession of a firearm conviction.

### C. Aggravating Gang-Related Sentencing Factors

Franklin also argues that the State presented insufficient evidence to support his gang aggravating sentencing factors because (1) the State relied solely on Ringer's generalized expert testimony that gang members commit crimes to avenge disrespect and to increase their status within the gang, but (2) it did not present any evidence that Franklin's alleged drive-by shooting and assault on Grossman actually benefited his gang. This argument fails.

Under RCW 9.94A.535(3)(aa), the trial court may impose a sentence above the standard range if the jury finds beyond a reasonable doubt that "[t]he defendant committed the offense with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as defined in RCW 9.94A.030, its reputation, influence, or membership." RCW 9.94A.535(3)(aa). We previously upheld a gang aggravating sentencing factor where the State presented evidence that (1) the defendant was a member of the Hilltop Crips; (2) he perceived the victim as a member of a rival gang; (3) the two gangs had a previous confrontation four days earlier, during which a Hilltop Crips member threatened to open fire on the rival gang; and (4) the defendant shot the victim after uttering, "'This is Hilltop Crip, cuz, what you know about that.'" *Yarbrough*, 151 Wn. App. at 97 (quoting verbatim report of proceedings). In *Yarbrough*, there was expert testimony that calling a rival gang member "'cuz'" is an insulting challenge showing disrespect, that gang members gain status in a gang by showing their willingness to fire weapons to defend the gang's honor, and that a gang member

perceived as unwilling to defend his "'home boys'" may be kicked out. *Yarbrough*, 151 Wn. App. at 97 (quoting verbatim report of proceedings). We held that a jury could infer from this evidence that the defendant had committed the crime to advance or to maintain his position in the gang.[31] *Yarbrough*, 151 Wn. App. at 97.

Similarly here, Franklin admitted having been "jumped into" the Eastside Gangster Crips, having several gang tattoos, and having a blue bandanna (symbolizing gang affiliation) on him the night of the shooting. Morris, the intended victim, was a member of the rival gang Young Gangster Crips. A week before the drive-by shooting, the two gangs had engaged in a confrontation, during which fellow Eastside Gangster Crips member Kennedy's gold necklace was stolen and eventually came into Morris's possession. Morris had taunted Kennedy, stating that Kennedy needed "to pay" or "to fight" him to get the necklace back; the two men had continued "having problems" with each other the following week. 9 VRP at 929, 12 VRP at 1451. On the way to the drive-by shooting of Morris's car, (1) Kennedy had collected Franklin and two other men associated with the Eastside Gangster Crips (Johnson and Evans); and (2) Franklin had texted his girlfriend that she should "'use [her] head,'" he was "'handlin'

---

[31] In contrast, in *Bluehorse*, we reversed a gang-aggravated sentencing factor based on insufficient evidence where, although the State had presented generalized expert testimony that gang members retaliate against rival gangs for showing disrespect and to advance their status, there was no evidence that Bluehorse (1) had announced a rival gang status contemporaneously with the shooting, (2) had been disrespected or provoked by rival gang members, or (3) had made any statements that he committed the drive-by shooting for reasons related to his gang status. *Bluehorse*, 159 Wn. App. at 430-31. Accordingly, we held that there was insufficient evidence to support an inference that Bluehorse had committed the drive-by shooting "for reasons related to obtaining or maintaining gang membership or advancing [status] in the gang" and, consequently, insufficient evidence to support the gang-related aggravated sentence. *Bluehorse*, 159 Wn. App. at 431. The facts here, however, differ significantly, as we note above.

business,'" he had just gotten "jacc't," and he was going to "give some[one] the blues."[32] 11 VRP at 1320.

Ringer testified that (1) a showing of disrespect, such as one gang member's taking another gang member's gold necklace, often results in disproportionate levels of violence in gang culture; (2) both the gang's and an individual gang member's reputations are important, and neither wants to be perceived as "weak"; (3) gang members can gain status within a gang by showing their willingness to participate in drive-by shootings to defend the gang's honor; (4) fellow gang members are expected to "step up" in such situations to help retaliate; and (5) gang members who fail to "step up" face being "checked" by their own gang. 12 VRP at 1484, 1487, 1488. A reasonable jury could infer from this evidence that Franklin participated in the drive-by shooting of Morris's car and in the assault to benefit the Eastside Gangster Crips and/or to advance his (Franklin's) standing in the gang. Accordingly, we hold that the State presented sufficient evidence to support Franklin's gang-aggravated sentencing factors.

### III. OPINION TESTIMONY

For the first time on appeal, Johnson argues that Ringer's testimony—that gang members are not totally honest with law enforcement "[a]lmost 100 percent of the time"—was an improper comment on his (Johnson's) or another witness's guilt and credibility. Br. of Appellant (Johnson) at 11 (quoting 12 VRP at 1406). The State contends that Johnson failed to preserve this issue for appeal and, therefore, we should not address its substance. We agree with the State.

---

[32] Although the record does not show that Franklin, like Yarbrough, used recognized gang words like "cuz," the jury could infer that Franklin's text message evinced his gang-related purpose and intent.

34

## A. Scope/Standard of Review

It is uncontroverted that Johnson did not object at trial to this newly-challenged testimony. We may refuse to review any claimed error not raised in the trial court. RAP 2.5(a). Nevertheless, a defendant may challenge a claimed error for the first time on appeal if he can show that it was a manifest constitutional error affecting his constitutional right to a jury trial. RAP 2.5(a)(3); *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). But "[a]dmission of witness opinion testimony on an ultimate fact, without objection, is not automatically reviewable as a 'manifest' constitutional error." *Kirkman*, 159 Wn.2d at 936. To merit appellate review in these circumstances, a defendant must show that the alleged error caused "actual prejudice" or "practical and identifiable consequences" in his trial. *Kirkman*, 159 Wn.2d at 935. In this, Franklin fails.

## B. No Explicit Statement; No Constitutional Error

Ringer's challenged statement was not a direct comment about Johnson's individual guilt or credibility; rather, Ringer testified only that gang members are generally unwilling to cooperate with the police, which made Ringer apprehensive about believing Kennedy when he volunteered for a second interview and minimized his involvement in the shooting. Because Johnson did not testify at trial, his credibility was not in issue; Ringer's testimony, which thus did not pertain to Johnson, did not prejudice Johnson.

Similarly, Ringer's concerns about motive arguably pertained only to Kennedy's credibility, not Johnson's. Moreover, Ringer's statements about Kennedy did not express any opinion, directly or indirectly, that Johnson was guilty of the drive-by shooting. Despite expressing some apprehension about Kennedy's offer to participate in a second police interview,

35

Ringer did not testify that he believed Kennedy was lying during this interview. On the contrary, Ringer testified that, when a gang suspect requests a second interview, he and other police officers generally "work through the issues and try to get as much of the truth out as possible." 12 VRP at 1407. Ringer's testimony thus left open the possibility that portions of Kennedy's interview could have been truthful, despite Ringer's routine skepticism in such situations. Ringer's testimony was not a statement about Kennedy's, Johnson's, or another witness's guilt or credibility. We hold that Ringer's statement did not constitute improper opinion testimony rising to the level of a constitutional error that Johnson can raise for the first time on appeal.[33]

### C. No Prejudice; Alleged Error not Manifest

Because Johnson fails to show constitutional error warranting our review of this non-preserved error, we need not address whether the alleged error was "'manifest,'" i.e., whether it was prejudicial or had "'practical and identifiable consequences'" in the trial below. *See* RAP 2.5(a)(3); *State v. Bertrand*, 165 Wn. App. 393, 400 n.8, 267 P.3d 511 (2011) (internal quotation marks omitted) (quoting *State v. Grimes*, 165 Wn. App. 172, 185-87, 267 P.3d 454 (2011), *review denied*, 175 Wn.2d 1010 (2012)), *review denied*, 175 Wn.2d 1014 (2012). Nevertheless, we note that Ringer's implied concerns about Kennedy's credibility would not have been prejudicial to Johnson; on the contrary, concerns about Kennedy's credibility would have helped

---

[33] For non-preserved allegedly improper opinion evidence to qualify under the RAP 2.5(a)(3) exception, "'[m]anifest error' requires a *nearly explicit* statement by the witness that [he] believed the accusing victim'" or disbelieved another key witness. *Kirkman*, 159 Wn.2d at 936 (emphasis added).

Johnson by casting doubt on Kennedy's damaging testimony about Johnson's gang affiliation and involvement in the shooting.[34]

Furthermore, under analogous circumstances, the Washington Supreme Court has concluded that there was no prejudice where, despite allegedly improper opinion testimony on witness credibility, the trial court had properly instructed the jury that jurors "'are the sole judges of the credibility of the witnesses and of what weight is to be given to the testimony of each'" and that jurors "'are not bound'" by expert witness opinions. *Kirkman*, 159 Wn.2d at 937 (quoting Clerk's Papers). The trial court here gave virtually identical instructions,[35] which we presume the jury followed. *Kirkman*, 159 Wn.2d at 937. Thus, even if Ringer's statement had been an unconstitutional, and therefore improper, opinion about Kennedy's, Johnson's, or another witness's guilt or credibility, Johnson fails to show actual prejudice or practical and identifiable consequences to the trial results justifying an exception to RAP 2.5(a)'s preservation requirement that the alleged error be "'manifest.'" *Bertrand*, 165 Wn. App. at 400. Johnson having failed to show that admission of Ringer's testimony was a manifest constitutional error that may be raised for the first time on appeal under RAP 2.5(a)(3), we do not further address his

---

[34] For this reason, as in *Kirkman*, Johnson's counsel may have chosen not to object to Ringer's testimony as a matter of trial strategy. *See Kirkman*, 159 Wn.2d at 937. In *Kirkman*, the Supreme Court also noted that such tactical reasons helped show that the defendant did not suffer any prejudice under the RAP 2.5(a)(3) analysis. *See Kirkman*, 159 Wn.2d 937.

[35] The trial court instructed the jury:
> You are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness.

CP at 473 (Instruction 1).

Consol. Nos. 42027-9-II and 42031-7-II

improper opinion testimony argument.

We affirm Franklin's and Johnson's convictions and Franklin's gang-enhanced standard-range sentences.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, J.

We concur:

Johanson, A.C.J.

Bjorgen, J.

38